# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
June 20, 2011 Session

## K.B.J. v. T.J.[1]

### Appeal from the Circuit Court for Hamblen County
#### No. 08CV113      Kindall T. Lawson, Judge

### No. E2010-01157-COA-R3-CV-FILED-AUGUST 26, 2011

This is a contested divorce case involving two minor children. K.B.J. ("Husband") was the first to file a complaint for divorce. T.J. ("Wife") answered his complaint and coupled a counterclaim with her answer. The trial court found that Husband was guilty of inappropriate marital conduct and awarded Wife a divorce, but made Husband the primary residential parent of the minor children with final authority on certain parental decisions. The court ordered equal parenting time on an alternating week basis. It also denied Wife's request for spousal support and allocated to her approximately $32,350 of the marital debt. Wife appeals. We reverse that part of the judgment making Husband the primary residential parent with final decision-making authority and modify the parenting schedule. In all other respects, the judgment of the trial court is affirmed.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed in Part, Modified in Part and Affirmed in Part; Case Remanded

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

Robert L. Jackson and Elizabeth A. Garrett, Nashville, Tennessee, for the appellant, T.J..

Jill R. Talley, Dandridge, Tennessee, for the appellee, K.B.J..

---

[1]In order to protect the anonymity of the parties' minor children, the Court, in its discretion, has elected to use initials for the children, their parents, and one other.

# OPINION

## I.

The parties had been married 17 years at the time the final judgment was entered. On that date, the parties' oldest child, a son named C.A.J., was 12, and his younger sibling, a female child named A.B.J., was 7 years of age.

Despite Husband's denial of some of his activities and the minimization of the remainder, there is no serious dispute that Husband is primarily responsible for the breakup of this marriage. Husband admitted visiting gay pornographic web sites and even admitted numerous private meetings with another male whose first name starts with an "R" during which, according to him, the two of them watched pornography and masturbated but did not touch each other. He also admitted a face-to-face meeting with a woman he found on an adult dating site, but claimed that he only met with her and talked, but nothing else happened. Further, he admitted driving to meet a Loudon County couple he had met on a similar web site, but claimed that he backed out at the last minute and did not meet them.

Husband insisted throughout the trial that there was nothing wrong with his extramarital sexual activity as described by him. Wife testified that Husband's use of pornography had been longstanding and that, each time she caught him involving himself with pornography, he promised to stop. She testified that his activities became intolerable to her when Husband admitted to having a homosexual affair with R. She learned of his activities by investigating credit card charges, and through computer software that allowed her to recreate web pages that Husband had visited. Copies of the web pages included registration profiles that Husband created on numerous web sites including gay web sites. Husband denied creating a profile on gay web sites, but admitted creating profiles and purchasing time on other adult web sites. He claimed that some co-worker had emailed the gay site registration profile to him as a joke. However, the record indicates that the gay site profile contained considerable personal information that was accurate and that it matched profiles he did create. As we have stated, the trial court awarded the divorce to Wife.

Husband testified that Wife told him she was going to leave him for a co-worker. However, on cross-examination, he admitted that he did not mention the alleged affair with the co-worker when asked in a deposition about the reasons supporting his request for a divorce. Wife denied making the statement and testified that the only time she had met with the co-worker outside the office was at a group gathering. The only other criticism of a sexual nature of Wife that Husband offered was that she began to withhold sex from him.

He testified that she sometimes sent him text messages with photographs of her private parts, but these were in response to sexually-suggestive text messages he had sent her.

Husband was 40 at the time of the divorce and Wife was 39. Husband had two years of college . He had been employed as a diesel mechanic at a heavy equipment dealership for 13 years. He earns a gross salary of $3,969.33 monthly. He presented proof of monthly expenses that exceed his take-home pay by approximately $400. According to Husband, his father helps him with the shortfall. His expenses after the divorce include the mortgage payment on the marital home which the trial court, with the agreement of the parties, awarded to Husband, and a car payment on an automobile that was awarded to Wife by agreement.

Wife secured a bachelor's degree in interior architecture during the course of the marriage. She worked throughout the marriage. When the complaint was filed, she worked in marketing for a company called Hearthstone. She was earning a gross income of $43,000 per year. Not long after the complaint was filed, she moved into an apartment close to the marital home. Before the case came to trial, Hearthstone went out of business and Wife was "laid off." At the time of trial, she was drawing unemployment compensation benefits of $300 per week.

Prior to the initiation of this divorce action, Wife was the children's primary caregiver. She typically arranged her work schedule and responsibilities so she could work from home. She took the children to and from school. She attended school meetings. She was responsible for taking the children to medical appointments. Husband became more involved with the children after the separation.

Husband's work schedule does not allow him to take the children to school or pick them up from school. He leaves home before 7:00 a.m. to drive to work in Knoxville and does not return home until 5:00 p.m. or later. In February 2009, the trial court approved a temporary parenting arrangement of shared parenting on a 50/50 time arrangement. Husband had the children from noon on Sunday for one week and then, beginning at noon on the following Sunday, Wife had them for a week. During Husband's week with the children, he was forced to depend on his father, the children's grandfather, to take the children to and from school. The children's grandfather drove from his home in Knoxville to the marital home in Hamblen County so that he could drive the children to school in the morning. In the afternoon, the grandfather picked the children up from school in Hamblen County and drove them to Husband's place of employment in Knoxville, where they waited for him to finish his work, following which Husband returned to Hamblen County with the children. During Husband's week, the children spent approximately two hours a day in transit, plus the time they spent waiting for Husband to finish his shift. At the final hearing, Wife testified that she objected to continuing the 50/50 parenting arranged because the best interest of the children

would be better served by awarding her the majority of the residential time with the children. Her reasons were (1) the historical fact that she had been the children's primary caregiver; (2) Husband's troublesome work schedule; and (3) some behavioral instability she had observed in him. The trial court, nevertheless, continued the 50/50 parenting time in the final order[2]. The court made Husband the primary residential parent. The parties were given joint-decision making authority with regard to medical and educational matters, but, in the event the parents could not agree, Husband was given final decision-making authority.

Going into the divorce, the parties had combined marital debt of approximately $106,000. While this action was pending, Husband filed a petition in bankruptcy and obtained a discharge of approximately $60,000 in consumer debt that he had accrued during the marriage. Wife characterized his debt as being for a race car and other "toys." The remaining debt of approximately $46,000 was incurred by Wife. She did not join Husband in the bankruptcy; therefore, at the time of the final hearing, the debt was unpaid. Wife explained that she did not want to go into bankruptcy because she did not want to harm her credit. She noted that she had always made a practice of paying her debts. The trial court accepted her testimony that approximately $2,300 of the $46,000 in debts was for hospital bills for the children, and that $25,000 represented student loan debt. This $27,300 of the marital debt, the court divided equally between the parties. Approximately $18,700 of marital debt remained which the trial court made the obligation of Wife, thus making an allocation of total debt to her of approximately $32,350.

Wife testified that her lack of employment left her with monthly expenses of $685 over and above her income. She asked the trial court to award her spousal support. The trial court declined to do so. The court noted that Husband also showed expenses that were more than his income. The court did, however, order Husband to pay up to $3,000 toward Wife's attorney's fees.

At the time of trial, Wife lived only four miles from the marital home and the school the children attend. However, while the divorce was pending, she had notified Husband that she intended to relocate with the children to Clarksville because she thought her employment prospects were better there and because she had been accepted into the graduate program at Austin Peay University. Husband filed a notice that he objected to the relocation. Both parties submitted alternative parenting plans showing their proposed allocation of parenting responsibilities if Wife lived in Morristown and if she lived in Clarksville. Wife made it known that she would not move to Clarksville with the children unless she could do so with the permission of the court. Accordingly, the court did not determine whether or not Wife could relocate, but it did determine that the children should remain in Morristown where they

---

[2]There is proof in the record that during Wife's parenting time the children sometimes arrived at school tardy. The court noted this fact, but found no reason to change Wife's equal co-parenting time.

had strong ties. On appeal, Wife is "not disputing the trial court's ruling that the children will remain in Morristown . . ."

II.

Wife raises three issues which we have re-phrased slightly:

> Whether the trial court erred in ordering equal parenting time with Husband being the primary residential parent with final decision-making authority.

> Whether the trial court erred in its allocation of marital debt.

> Whether the trial court erred in refusing to award Wife spousal support.

III.

The trial court's factual findings are reviewed *de novo* with a presumption that they are correct unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); **Kendrick v. Shoemake**, 90 S.W.3d 566, 570 (Tenn. 2002). Because " 'the details of custody and visitation with children are peculiarly within the broad discretion of the trial judge,' " we review issues of primary custody and parenting time for abuse of discretion. **Eldridge v. Eldridge**, 42 S.W.3d 82, 85 (Tenn. 2001)(*quoting* **Suttles v. Suttles**, 748 S.W.2d 427, 429 (Tenn. 1998)). "Defining marital debt and determining what factors should guide the allocation of marital debt are questions of law. We review questions of law *de novo* with no presumption of correctness." **Alford v. Alford**, 120 S.W.3d 810, 812 (Tenn. 2003). "As a general matter, we are disinclined to alter a trial court's spousal support decision unless the court manifestly abused its discretion." **Goodman v. Goodman**, 8 S.W.3d 289, 293 (Tenn. Ct. App. 1999).

IV.

We begin with Wife's argument that the trial court erred in failing to award spousal support. The trial court's analysis was as follows:

> I don't think it's a case where I should order spousal support, because [Husband] doesn't have it in the first place, and there are other factors. I think the fact that they've both worked, she's educated more so than he – so . . . I won't do that.

-5-

Wife argues that trial court abused its discretion because, according to her, the above quote shows that the court did not consider all of the statutory factors it is obligated to consider under Tenn. Code Ann. § 36-5-121(i) (2010).[3] It is true that the statute is phrased in terms

[3]The statute states,

> In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:
>
> (1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
>
> (2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;
>
> (3) The duration of the marriage;
>
> (4) The age and mental condition of each party;
>
> (5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
>
> (6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;
>
> (7) The separate assets of each party, both real and personal, tangible and intangible;
>
> (8) The provisions made with regard to the marital property, as defined in § 36-4-121;
>
> (9) The standard of living of the parties established during the marriage;
>
> (10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;
>
> (11) The relative fault of the parties, in cases where the court, in its

(continued...)

of what the trial court "shall consider;" however, we are not required to interpret the trial court's silence with respect to factors that were not particularly weighty as a refusal or failure to consider those factors. Indeed, our Supreme Court has acknowledged that the determination of spousal support is not to be done by "formula" and that the two most important factors are need and ability to pay. *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995); *see also* *Robertson v. Robertson*, 76 S.W.3d 337, 342 (Tenn. 2002). In the present case, the proof indicates that Husband, even without an award of spousal support, is left with obligations that far exceed his income. Wife is college educated, and, while she is presently in financial need due to her lack of employment, she is not without the ability to work and earn money. *See* *Gordon v. Gordon*, No. E2010-00392-COA-R3-CV, 2010 WL 4244345 at *5 (Tenn. Ct. App. E.S., filed Oct. 27, 2010)(wife had earning capacity as an airline pilot even though she was presently without a job in that industry). We also note that in her brief Wife only complains that "the trial court did not consider all the factors," but, other than emphasizing her need, she fails to indicate which factors, if any, compel an award of spousal support. Moreover, she does nothing to explain how Husband would be able to pay support. We conclude that the trial court's denial of spousal support is not illogical or contrary to the law. *Eldridge,* 42 S.W.3d at 85 ("A trial court abuses its discretion only when it 'applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.' *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999).") (Brackets in original.) At best, reasonable minds could disagree about whether Wife, being unemployed, should have received some amount of support for the short term. *Id*. ("Under the abuse of discretion standard, a trial court's ruling 'will be upheld so long as reasonable minds can disagree as to propriety of the decision made.' *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000); *State v. Gilliland*, 22 S.W.3d 266, 273 (Tenn. 2000).") Therefore, the trial court did not abuse its discretion in denying Wife's request for spousal support.

We turn now briefly to the issue of whether the trial court erred in its allocation of approximately $18,700 in marital debt solely to her.[4] Wife argues that rather than equitably dividing the debt as it was required to do, the trial court made the decision that she accepted the debts as hers by refusing to join in Husband's bankruptcy. She is correct that "marital debts are subject to equitable division in the same manner as marital property." *Alford,* 120

---

[3](...continued)
  discretion, deems it appropriate to do so; and

  (12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

[4]The court allocated $32,350 in debt to Wife. She only challenges the propriety of $18,700 of the total.

S.W.3d at 813. In this case, the parties divided the assets by agreement, the result of which was to allocate the marital home to Husband with the remaining mortgage debt, plus the new obligation of paying Wife's car payment of $504 per month, in exchange for any equity she had accrued in the marital home. The only debt in dispute was the "consumer" portion of $46,000 in debt Wife had accrued. More than half of the $46,000, consisting of $25,000 in student loan debt and approximately $2,300 in hospital bills for the children, was divided equally between Husband and Wife.

While we do not agree with the trial court or Husband's assertion that Wife somehow personally assumed marital debts by refusing to join Husband in bankruptcy, we do agree with the proposition that Husband has done all he is able to do to bear the financial burden of the dissolution of this marriage. "Tennessee courts should use. . .four factors. . . as guidelines in the equitable distribution of marital debt: (1) the debt's purpose; (2) which party incurred the debt; (3) which party benefitted from incurring the debt; and (4) which party is best able to repay the debt." *Alford*, 120 S.W.3d at 814. The goal is to achieve "the fairest possible allocation of debt." *Id*. The distribution of assets and other debts plus the child support obligation left Husband with an income of approximately $1,000 less than known expenses. Given the financial burden on Husband in light of the distribution of assets and other debts, we find nothing inequitable about holding Wife responsible for the challenged $18,700 in marital debt that she incurred. Accordingly, we hold that the trial did not err in its allocation of marital debt.

We have saved the most important issue – the identity of the primary residential parent and parenting time – for last. Wife argues that the trial judge made its determinations, not based on a reasoned exercise of discretion, but out of a misdirected focus on whether she could move to Clarksville and whether the parties had agreed on parental decision making. We have reviewed the transcript and we believe there is merit to Wife's argument. The only statutory factor[5] that the trial court treated as particularly weighty in resolving the custody/co-

---

[5]The statutory factors that the court "shall consider" in setting the residential schedule are listed in Tenn. Code Ann. § 36-6-404(b)(2010). They are:

> (1) The parent's ability to instruct, inspire, and encourage the child to prepare for a life of service, and to compete successfully in the society that the child faces as an adult;
>
> (2) The relative strength, nature, and stability of the child's relationship with each parent, including whether a parent has taken greater responsibility for performing parenting responsibilities relating to the daily needs of the child;
>
> (3) The willingness and ability of each of the parents to facilitate and

(continued...)

parenting time issue was the stable environment offered by "the marital home" versus the

[5](...continued)

encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interests of the child;

(4) Willful refusal to attend a court-ordered parent education seminar may be considered by the court as evidence of that parent's lack of good faith in these proceedings;

(5) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(6) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(7) The love, affection, and emotional ties existing between each parent and the child;

(8) The emotional needs and developmental level of the child;

(9) The character and physical and emotional fitness of each parent as it relates to each parent's ability to parent or the welfare of the child;

(10) The child's interaction and interrelationships with siblings and with significant adults, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(11) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(12) Evidence of physical or emotional abuse to the child, to the other parent or to any other person;

(13) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(14) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(15) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(16) Any other factors deemed relevant by the court.

instability of moving the children. The court noted that the children have "gone to school there and have friends there [and] . . . extended family there." "While '[t]he details or child custody and visitation arrangements are generally left to the discretion of the trial court . . . this discretion is not unbounded.' " *D v. K*, 917 S.W.2d 682, 685 (Tenn. Ct. App. 1995)(brackets and omitted material in original; citations omitted). It is our job in reviewing for an abuse of discretion to see that the trial court's order is made with due regard for controlling law and based on the facts proven in the case. *Id*. We are persuaded that the trial court's reasoning over-emphasizes the importance of the marital home and under-emphasizes other important facts proved in the case. We note that nothing in the judgment ties Husband's designation as primary residential parent directly to the home where the children have lived. In other words, Husband could move from the marital home at any time without effecting a change in the court's order. Wife also lives in the Morristown community, within four miles of the children's school. It is true that Wife expressed a desire to move to Clarksville, but it is also apparent that Wife did not take the position at trial that moving to Clarksville was an all or nothing proposition. She made it clear that she would only move to Clarksville if she could do so with the children. She presented two alternative parenting plans for the court to consider – one in case the court agreed she could move the children to Clarksville and one in case the court decided they should stay in Morristown. The case was tried and argued as one with three possible outcomes, *i.e.*, (1) the children reside with Husband in Morristown; (2) the children reside with Wife in Morristown; or (3) the children reside with Wife in Clarksville. Thus, while there is no reason to question the trial court's determination that it is in the best interest of the children to stay in Morristown, this does not automatically mean that Husband should be the primary residential parent.

There are factors to which the trial court gave little or no consideration that weigh heavily in Wife's favor. She has, beyond dispute, "been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities." Tenn. Code Ann. § 36-6-404(b)(6). The trial court recognized Wife's historical role as the primary caregiver, but concluded that the weight of that factor was offset by Husband's role as provider. Given that Husband had little activity as a caregiver before the separation and the further fact that Wife also worked and contributed financially throughout the marriage, we believe the trial court erred in not assigning significant weight to Wife's role as primary caregiver. Furthermore, it is clear that Husband's "employment schedule" prevents him from taking the children to school or picking them up from school. *See*, *id.*, § 36-6-404(b)(15). Wife's employment schedule has historically been subservient to the needs of the children. The trial court's award of primary residential parent status to Husband, with an equal and inflexible parenting schedule, has the undesirable effect of making the grandfather a de facto parent for several hours every other week when Wife is available to care for them and is asking to be allowed to fill that role. *See Miller v. Miller*, 336 S.W.3d 578, 585 (Tenn. Ct. App. 2010).

Another factor that did not receive adequate treatment in this case is Husband's wrongdoing and continued denial or minimization or his wrongdoing. While the trial court did not explicitly make a determination of Husband's credibility, it awarded the divorce to Wife. It obviously did not believe Husband's attempt to deny wrongdoing and to pass his activities off as harmless diversions. We have reviewed the transcript of Husband's testimony and find that the evidence preponderates strongly in favor of finding that Husband had an uncontrolled problem with internet pornography and with extramarital relationships initiated through the internet, all of which he tried to falsely deny or portray as innocent. We have repeatedly held that a spouse's wrongdoing and denial of wrongdoing can reflect on the comparative fitness of that party as a parent. *See Miller*, 336 S.W.3d at 583 (*citing Barnhill v. Barnhill*, 826 S.W.2d 443, 453 (Tenn. Ct. App. 1991)) (for the proposition that marital misconduct can reflect on fitness of a parent); *Id*. at 584 (*citing Carden v. Carden*, No. 01A01-9502-CH-00042, 1995 WL 689728 at *4 (Tenn. Ct. App. M.S., filed Nov. 22, 1995)) (for proposition that dishonest denial of wrongdoing can reflect on fitness). Such activity relates to the "parent's ability to instruct, inspire, and encourage the child to prepare for a life of service, and to compete successfully in the society that the child faces as an adult" as well as the parent's "character" as it relates to child-rearing. Tenn. Code Ann. § 36-6-404(b)(1) &(9); *See Carden*, 1995 WL 689728 at *4.

We also agree with Wife that the trial court's parenting determinations appear to be based to a degree upon frustration that Wife would not agree to the continuation of the 50/50 parenting arrangement set in place by the temporary parenting plan. Immediately after being told that Wife would not agree to a pure "joint custody" arrangement, the court announced:

> Okay. All right. The father will be the primary parent with a 50/50 time sharing arrangement.

When counsel for Wife inquired about parental decision making, the court stated "nobody would say it [was joint], so I gave it to the father." Later, in response to a request for clarification, the court stated, "I couldn't even get them to agree on joint decision making – then he's the primary parent." It is axiomatic that a parent must be able to refuse to submit to an equal parenting arrangement the parent believes in good faith is not in the best interest of her children without fearing that her refusal will become, in whole or in part, the basis for an adverse ruling.

For all the reasons we have outlined – and because of no one of them alone – we hold that the trial court abused its discretion in making Husband the primary residential parent with final decision-making authority, and in setting the parenting schedule on a 50/50 alternating week schedule. We hold that Wife is designated as the children's primary residential parent. For the same reasons that persuade us Wife should be the primary residential parent, we believe that she, rather than Husband, should have the final say on

educational and health-related decisions in the event the parties cannot agree. Wife correctly points out in her brief that Husband's work schedule, as a practical matter, prevents him from being at many of the school functions and medical appointments – events that will impact the decisions that must be made. Finally, we hold that the parenting schedule must be modified to accommodate Husband's work schedule so as to eliminate the lengthy daily commute of the children from Morristown to Knoxville and back. We believe that in light of Wife's availability through the school week, and Husband's unavailability, the best way to accomplish this is to shift more time to Husband on weekends and more time to Wife during the school week. Accordingly, the following co-parenting time is established to take the place of the co-parenting/visitation schedule set forth in the parenting plan adopted by the trial court:

1. In general, the parties' children shall be in the physical custody of Wife from 7 p.m. Sunday until they are picked up by Husband after work on the Fridays when he has weekend time with the children.

2. Husband shall have the physical custody of the children for three out of every four weekends, with Husband's first weekend beginning on Friday, September 2, 2011, when he picks up the children after he gets back to Hamblen County after work. Husband's weekend will end at 7 p.m. Sunday when he returns the children to Wife. Husband will be responsible for feeding the children before returning them to Wife. After Husband has the children for three consecutive weekends, Wife shall have them for the next weekend and thereafter the parties will resume the three consecutive weekends for Husband/one weekend for Wife rotation.

3. When non-Christmas holidays are on Monday, the party with the children for the weekend immediately preceding the Monday will have physical custody of the children for the Monday holiday. When Husband has them on the holiday, he will return them to Mother by 7 p.m. on Monday after feeding them the evening meal. If the children are in school on a Monday holiday, this provision will not be applicable.

4. The Thanksgiving holiday – being defined as beginning on Wednesday when the children get out of school and ending on the Friday after Thanksgiving at 7 p.m. – shall be alternated from year to year with Husband having the holiday with the children in 2011.

5. The Christmas holiday – being defined as when the children get out of school for Christmas and ending at 7 p.m. on the day before the children go back to school – is divided into two segments with the first segment beginning when the children get out of school for Christmas. The first segment will end and the second segment will begin at 4 p.m. on Christmas Day. In 2011, Husband will have the first segment of the Christmas vacation

period and Wife will have the second segment. Thereafter, the parties will alternate the segments on a year to year basis.

6. The parties will alternate the children's Easter vacation on a yearly basis. Wife will have the children for the Easter vacation in 2012.

7. The parties will equally divide the children's summer vacation time.

8. The 4th of July celebration will be alternated from year to year. Husband will have the children for the 4th of July in 2012.

9. The parties will equitably share the children's time on the children's birthdays, the parents' birthdays, Mother's Day, and Father's Day.

10. Items No. 1 and No. 2 are generally applicable; however, the provisions of Nos. 3-9 will take priority over the general schedule.

This co-parenting schedule will go into effect immediately upon the release of this opinion. If the children are not in Wife's care and custody at the time this opinion is released, they will be delivered to her residence no later than 7 p.m. on Friday, August 26, 2011.

V.

The issue of child support is not before us on this appeal. However, the changes that we have decreed with respect to the identity of the primary residential parent and, more importantly, the allocation of parenting time between the parties, necessitates that the trial court revisit the issue of child support. Accordingly, this case will be remanded for this purpose.

VI.

The judgment of the trial court is reversed in part, modified in part, and affirmed in part. That part of the judgment making Husband the primary residential parent with final decision-making authority for educational and health related decisions is reversed. Wife is made the primary residential parent with final decision-making authority in the event the parties are unable to agree on health and educational decision. The parenting schedule is modified as set forth in this opinion. That part of the judgment allocating marital debt and denying Wife spousal support is affirmed. Court costs on appeal are taxed 50% to Husband and 50% to Wife. This case is remanded to the trial court to hold a hearing to determine the

appropriate amount of child support to be paid by Husband to Wife pursuant to the Child Support Guidelines.

_____
CHARLES D. SUSANO, JR., JUDGE