IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 9, 2012 Session

## ANGELIA LYNETTE MAUPIN v. PAUL WAYNE MAUPIN

**Appeal from the Chancery Court for Greene County**
**No. 20080084      Thomas R. Frierson, II, Chancellor**

**No. E2011-01968-COA-R3-CV-FILED-APRIL 29, 2013**

This is an appeal from a judgment in a contested divorce. After a trial of approximately one week, the court entered a judgment that, with regard to the issues on appeal: (1) split the family by making Angelia Lynette Maupin ("Mother") the primary residential parent of the parties' daughter and designating Paul Wayne Maupin ("Father") the primary residential parent of the parties' two sons; (2) ordered Mother to pay prospective child support ; and (3) awarded the marital residence to Father and made him solely responsible for the debt secured by the residence, and ordered Mother to pay half of any deficiency balance in the event of a foreclosure. On Father's motion to alter or amend, the court made the child support obligation retroactive to the date of the parties' separation. The record shows that Mother has been unable to spend any individual parenting time with her sons since the parties separated in April 2009. Mother appeals. We reverse that portion of the trial court's judgment ordering that Mother shall be responsible for paying half of any deficiency in the event of a foreclosure. We modify the trial court's judgment to provide for family counseling. In all other respects, the trial court's judgment is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Reversed in Part, Modified in Part and Affirmed in Part; Case Remanded**

CHARLES D. SUSANO, JR., delivered the opinion of the Court, in which D. MICHAEL SWINEY, J., and BEN H. CANTRELL, SR.J., joined.

David L. Leonard, Greeneville, Tennessee, for the appellant, Angelia Lynette Maupin.

Roger A. Woolsey, Greeneville, Tennessee, for the appellee, Paul Wayne Maupin.

**OPINION**

I.

After dating in high school, the parties were married on October 2, 1993. They have three children. The oldest is Sarah, born November 20, 1998. The middle child is Karter, a son, born December 13, 1999. The youngest is a son named Alex, born August 30, 2002.

When they married, Father worked at the local Lowe's store. Mother worked at Laughlin Memorial Hospital in Morristown. She had been employed there since October 1989. Shortly after the marriage, Father quit his job and remained unemployed, except for some farming with his parents, until approximately 1998 when he began working part-time as a mail carrier. Mother testified at trial that Father quit his job against her wishes. Father claimed that they agreed he should concentrate on farming. Father never showed any profit from his farming activities, however, except for one year when he sold a tobacco allotment for approximately $40,000.

In addition to her full-time job at the hospital, Mother began selling jewelry. She also recruited numerous people who sold jewelry under her sponsorship. She was allowed a commission on their sales. In the years before marital discord arose, Mother netted, according to income tax records, approximately $5,000 per year from her jewelry business. By the time of the trial, her income from the business had fallen off significantly.

Mother began an extramarital affair with a co-worker, L.S., in January 2007. Father learned of the affair in April 2007, when he found a string of emails between them. Mother admitted to the affair, and professed to have ended it in order to save the marriage. Father supposedly gave up farming to spend more time with Mother. He wrote Mother numerous cards and letters professing his undying love and commitment to the marriage. One such undated letter states:

> You are the most special person that I have ever met in my life and all the times that I was farming and away from you I regret but now I see and feel how much I enjoy being with you I never ever want to give it up. . . . I do need you and I am pleased to be your husband and I am pleased to [have] been lucky and smart enough to meet you. . . . I promise to love and respect you and your body 'til the day that I die. . . .

The parties attended marriage counseling sessions with two different preachers. Unbeknownst to Father, the affair continued through June 2008. It ended, according to Mother, when Father brought the boys to L.S.'s apartment. Mother filed a complaint for

divorce shortly thereafter. Nevertheless, the parties lived together in the marital residence until April 2009.

Mother testified that she intended to work to save the marriage, but that Father's behavior did not match the sentiments in the cards and letters. She said he made cohabitation impossible. According to Mother, Father would berate her continuously, often in the presence of the children. He would call her "worthless" and "lazy" and tell her that she did not deserve to be the mother of the children. This, according to Mother, drove her back to Mr. S. on a "start and stop" basis. Mother started recording her conversations with Father.

Father testified at trial, consistent with his rants in the recordings,[1] that Mother was lazy and did not deserve the children. He claimed that she usually came in from work and went to sleep rather than spending time with the family. He testified that the children were practically always with him. He also testified that it was he and his family that took responsibility for the children, including transporting them to and from school and pre-school. Mother testified that, while Father did spend time with the children, and did most of the cooking, he spent most of his time farming with his parents. Mother testified that she, rather than Father, was the parent who took responsibility for transporting the children. In support of her position, Mother submitted numerous exhibits showing that, during the majority of the time, she signed the children in and out of pre-school and child care. She also introduced records showing that the family paid over $50,000 for child care, which she said was necessary because of her work schedule and Father's unavailability to care for the children, presumably because of his farming activities. The family also used two babysitters when the parents were not available.

The trial court found that "each party has established sufficient grounds for . . . absolute divorce." It declared the parties divorced pursuant to Tenn. Code Ann. § 36-4-129(b) (2010).

With regard to the parenting arrangements, the court made the following findings:

> Both parents appear appropriately disposed to provide the children with food, clothing, medical care, education and other necessary care. Both homes provide a stable, secure environment for the children. Mr. and Mrs. Maupin each manifest an ability to instruct and encourage the children in

---

[1]Mother played some of the recordings into the record, until the trial court tired of Father's profanities. The parties agreed that transcripts of the recordings, with profanities redacted, could be submitted as an exhibit. Later in this opinion, we will provide lengthy excerpts.

preparing them for a life of service, as well as to compete successfully in society.

The evidence preponderates in favor of a finding that during the marriage, Ms. Maupin engaged in a jewelry business in addition to her primary employment in the medical field. Her responsibilities in connection with offering jewelry for sale resulted in Ms. Maupin being absent from the home periodically. She occasionally traveled overnight in furtherance of this business. Mr. Maupin at times assisted Ms. Maupin in the business. He frequently cared for the children in her absence.

In January, 2007, Ms. Maupin became involved in an extramarital relationship with Mr. [L.S.]. The relationship continued until approximately April 2009. Learning of the affair caused great anxiety for the children. The parents' continued arguments, at times in the presence of the children, have effected a deleterious impact upon them. The daughter/father relationship between Sarah Maupin and Mr. Maupin began to deteriorate during the summer of 2008. By July of 2009, Sarah had ended overnight co-parenting time with her father.

The relationships between Karter Maupin and Alex Maupin and Ms. Maupin likewise began to deteriorate in 2008. By April 2009, the brothers began residing primarily with Mr. Maupin. By the time of trial in this cause, Karter and Alex Maupin maintained little contact with Ms. Maupin. They have expressed no present desire to restore a relationship with their mother.

The Court has considered the testimony of two experts, as presented by deposition. Dr. Charlton S. Stanley, Ph.D., A.B.P.P. a forensic psychologist, conducted a psychological evaluation of Ms. Maupin. Dr. Stanley met with Ms. Maupin on a couple of occasions and reviewed numerous telephone recorded conversations between Ms. Maupin, Mr. Maupin and their sons. Dr. Stanley observed that he was appalled by the disrespect shown to Ms. Maupin by Alex Maupin. By his report, Dr. Stanley indicated, *inter alia*, as follows:

-4-

Alex seems to be the dominant child in the family, despite his chronological age relative to the other children. He is what might be called an Alpha Male. This means that he makes every effort to dominate the other children. One of the things I am concerned about is that based on the recordings I have heard he appears to be extremely aggressive as well as full of anger. One noteworthy telephone conversation was on March 31, 2009. Approximately 4 minutes into the recording Alex makes accusations against his mother that she had done and said bad things to his father. Alex repeatedly calls his mother a liar and his father, who can be heard in the background, does not appear to do anything to intervene. Alex also references Angie's boyfriend.

The Court has reviewed transcripts of certain recorded conversations involving Mr. and Mrs. Maupin, the children and at times extended family members. The conversations occurred on March 28, 2009 [through] December 22, 2009. Illustrative of the strained relationship existing between Karter Maupin and Ms. Maupin is the following dialogue which occurred on April 11, 2009:

Angie [Mother]: I want to see you tonight, okay? I think you need to come home and just sleep here, okay?

\* \* \*

Karter [oldest son]: If you need to.

Angie: What do you mean if I need to?

Karter: If you'll leave, we'll come home and . . .

Angie: Who's telling you to say that?

Karter: Nobody.

Angie: Karter, I'm not leaving. I'm staying here. I told you from the beginning I'm not leaving you guys. I love you very much and I'm not leaving.

Karter: Then we'll stay here.

Angie: I'm your mother and you need to stay with me too. Okay?

Karter: We don't want to.

In connection with his psychological report, Dr. Stanley concluded that Ms. Maupin is situationally depressed. He provided the following diagnostic considerations with regard to Ms. Maupin:

Angie Maupin does not have any diagnosable personality disorder or mental disorder as defined in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV). She is under considerable situational stress that will be relieved once she is able to reunite with her sons appropriately and the problems with the father of her children are resolved.

Dr. Stanley further concluded that Mr. Maupin has pursued a course of parental alienation between Ms. Maupin and the parties' sons. During his testimony, Dr. Stanley provided the following conclusions:

Q: Okay. Now if you can give us specific examples what conduct on Mr. Maupin's part that would lead you to believe to a reasonable degree of psychological certainty that he is a parent alienator?

A: One of the thing [sic] that I heard several times is that he brought up her sexual activities,

her boyfriend, and that he would countermand her trying to tell the kids what to do.

Q: Anything else?

A: And there was a lot of stuff that was, I thought, pretty inappropriate that he would not let drop. And you could tell he was egging things on.

Q: You've talked about bringing up the sexual activities, you've talked about countermanding her orders, what else that you can remember that led you to believe there was parental alienation?

A: I think the thing was him going over and over and over again about her having this affair.

Upon the request of the Guardian *ad litem*, Dr. Wayne Tasker, Psy.D. LPC, LCSW, BCPC, conducted an evaluation in May 2010 regarding the emotional status of the children. Dr. Tasker met individually with Mr. and Mrs. Maupin as well as the children. Dr. Tasker testified that the children would benefit from a co-parenting residential schedule which included quality time with both parents. Dr. Tasker noted, *inter alia*, as follows:

A. What I told each one of them is that this is a detriment to the kids, period, not having contact. That was a problem. That they need some type – both parents need to be in the process of reestablishing their relationship with the non-custodial parent.

*   *   *

A. Definitely these kids need to have contact with each respective parent, and the problem is – my biggest problem was the length of how long this whole process had gone on. Not only was there damage from the actual, you know, divorce

-7-

proceeding, but the process being drawn out had done damage to the kids too.

*   *   *

So my recommendation is they do have contact, that the boys have contact with their mom, that the daughter has contact with the dad, and that basically the kids have contact with each other. You know, the two boys and the girl.

The guardian *ad litem* testified and concurred that it is important for the children to maintain a relationship with both parents. The evidence further preponderates in favor of a finding that Sarah Maupin has recently exhibited certain behavioral problems at school and is not performing academically at her full potential. Karter and Alex Maupin are performing well in school. They enjoy outdoor activities such as hunting and fishing and maintain keen interests and abilities regarding athletic endeavors. Mr. Maupin has for several years coached teams upon which his sons have played. Mr. Maupin has not completed the parent education seminar as required by T.C.A. 36-6-408, while Ms. Maupin has.

Based upon the applicable factors and other criteria upon which Tennessee courts have made parenting determinations, this Court concludes that the manifest best interests of the children will be served by establishing residential schedules and co-parenting responsibilities in accordance with the two Permanent Parenting Plans adopted contemporaneously. By virtue of the residential schedules established, Ms. Maupin shall serve as the primary residential parent for Sarah Maupin, while Mr. Maupin shall serve as primary residential parent for Karter and Alex. The co-parenting residential schedules have been designed so as to facilitate the siblings' shared time together during weekends, holidays and other vacation periods.

(Footnotes omitted.)

The court determined that Mother earns a gross monthly income of $4,902, and Father earns $2,360 monthly as a mail carrier. The court ordered Mother to pay child support, based on the child support guidelines promulgated by the Department of Human Services ("the Guidelines"), of $594 per month beginning January 20, 2011. The court found that there was no basis for a deviation from the Guidelines.

The schedules established in the two permanent parenting plans are practically identical. They provide each primary residential parent with 247 parenting days and the non-residential parent with 118 parenting days, in a fairly standard weekend, holiday and vacation schedule. The permanent parenting plans include a supplemental provision requiring, among other things, that the parents and the children "participate in appropriate, professional counseling, the scope and duration of which shall be determined by the respective health care professional."

With regard to the division of assets and liabilities, the court noted that Mother filed a schedule of assets and liabilities but that Father had not. The court awarded Mother her automobile, which is worth approximately $17,000 but made her solely responsible for the debt, which is $22,900. The court awarded Father two vehicles which are valued at $13,000, upon which there is no debt.

The court determined that contrary to Father's denials, he did have a partnership interest in farming with his father. Although some of the cows, which were part of that interest, were purchased at a cost of over $20,000 for a one-half interest of a cow, the court valued Father's farming interests, including equipment and livestock, at $37,500. The court awarded Father all of the farming assets. Although the court did not state exactly how they related to the Father's farming interests, the court noted that, during the marriage, Father "enjoyed significant lottery winnings" and received "income through a tobacco buyout." Mother testified that Father always handled the money and she, in fact, had to ask for money to buy gas and pay for lunch. Father, on the other hand, according to Mother, always carried a large roll of cash. He shared little, if any, financial information with Mother. Mother also testified that she did not know or understand why the indebtedness on the home had grown from under $100,000, to well over $200,000.

The court found that, during the marriage, Mother accumulated a retirement fund of $131,790.81. The court awarded 80% of the retirement balance to Mother and 20% to Father. The court made the parties equally responsible for any joint credit card balances and equally responsible for any balance owed on a "timeshare with Bluegreen Corporation" which had been the subject of a foreclosure.

The court awarded Father the marital residence, which it valued at $175,000. The court found that there is no equity in the marital residence because the unpaid balance on the mortgage, as of June 2010, several months before the court announced its decision, "was approximately $223,834." The court also found that $40,000 in proceeds from the sale of property that Mother owned before the marriage was applied toward the purchase and renovation of the residence. The court made Father "solely responsible for paying the indebtedness owed with regard to the [marital residence], holding [Mother] harmless from any liability in connection therewith." Nevertheless, the court held that in the event of foreclosure by the lender, "the parties shall be equally responsible for paying any deficiency balance due."

Father filed a motion to alter or amend the judgment seeking to make the award of child support retroactive to the time of separation rather than from the date of the court's decision. Mother filed a motion for contempt, asserting that she had received no parenting time with the boys. The court held a hearing on the pending motions. The court granted Father's motion and ordered that "Father shall have and receive a Judgment for retroactive support in the amount of $11,880 ($594 per month from April, 2009 through December, 2010)."

The court held an evidentiary hearing on Mother's motion that Father be held in contempt. The principal witnesses were Mother and Father. Mother testified that Father now spurns Sarah and avoids time with her even though Mother encourages such time together. She testified that numerous times Father has failed to pick up Sarah even though Mother and Sarah appeared at the appointed exchange location with Sarah's bags packed. Further, Mother has not had overnight visitation with the boys since the time the parties separated. She testified that the first time she tried to take the boys with her after the entry of the permanent parenting plan, the boys spit sunflower seeds at her while Father laughed. She testified that the boys will no longer answer her telephone calls, so she has resorted to writing letters. She has been able to have a few meals with the boys, but only with Father in attendance. She testified that she attends ball games and tries to interact with the boys but they will not talk to her or let her hug them. When she brings the subject up with Father, he tells her that she should leave them alone and let them be happy. He also says that he is unwilling to make the boys go with her and that he has no such obligation.

On cross-examination, Mother admitted that Father has told the boys in her presence that they need to go with her. She testified, however, that he says it in a hateful or scolding manner. She also admitted that she has been able to eat with the boys, with Father present, on approximately ten occasions since entry of the permanent parenting plan.

Father testified that he has encouraged the boys to go with Mother, but they just do no want to go with her. He testified that Mother usually arrives at the exchange point late and just stays in her vehicle demanding that the boys go with her. He testified that at the first exchange, Mother waved the court order and demanded that the boys go with her and demanded that Father force them to go. Law enforcement officers were present at the first meeting and talked to the boys and then suggested that they start by eating together. Father also testified that, as ordered by the court, he took the children to counseling with Dr. Tasker until the doctor passed them off to his associate. He continued to take them to the associate until the associate was no longer willing to see them. There was no testimony from either Dr. Tasker or his associate. At that hearing on the post-trial motions, the guardian ad litem testified that he had not interviewed the family or otherwise intervened as it was his belief that once the trial court entered its judgment he was relieved of his duties.

After hearing the evidence, the court made the following findings:

> The evidence preponderates in favor of a finding that despite Ms. Maupin's genuine desire and efforts to restore a meaningful relationship with the parties' sons, Karter and Alex Maupin, the children continue to present feelings of heightened anxiety with regard to spending co-parenting time with her. Since the entry of the Permanent Parenting Plan, Ms. Maupin has not exercised the co-parenting time with the boys as established in the Order. She has, however, had the opportunity on approximately ten occasions to share meals with Alex and Karter.
>
> Although these occasions have served to commence the process of restoring meaningful mother and son relationships, the boys continue to express their unwillingness to participate in the co-parenting time as established by the Court's Permanent Parenting Plan Residential Schedule. The evidence supports a determination that Alex and Karter Maupin have resisted their mother's requests to spend additional time with her. Their demeanor and actions include leaving when being approached by Ms. Maupin, spitting sunflower seeds in her direction, failing to return her phone calls, failing to respond to her letters, and declining her efforts to hug them. Since the divorce, Ms. Maupin has continued to tape record several conversations with the children present. On at least one occasion, Karter Maupin was found to be recording his conversation with Ms. Maupin. In addition, Ms. Maupin previously has possessed a copy of the

Permanent Parenting Plan at the time of the scheduled exchange for co-parenting times.

The evidence supports a determination that Mr. Maupin has encouraged the children to visit with Ms. Maupin during the times scheduled for an exchange. The boys, however, have refused to go with their mother.

Based on the above findings, the court held that Father was not in contempt of its order. Mother filed a timely notice of appeal from the trial court's order granting Father's motion to alter or amend.

## II.

Mother raises the following issues on appeal:

Whether the trial court erred when it designated Father as the primary residential parent of the boys and Mother as the primary residential parent of the girl.

Whether the trial court erred when it awarded the marital home as well as the debt on that home to Father but ordered that Mother would be responsible for one-half the mortgage deficiency in the event of foreclosure.

Whether the court erred when it awarded Father retroactive child support to April 2009 on Father's motion to alter or amend the judgment which ordered Mother to pay child support beginning January 2011.

## III.

## A.

Mother argues that the trial court erred in making Father the primary residential parent of the boys. Mother asserts she should have been designated as the primary residential parent based on the relevant factors in Tenn. Code Ann. § 36-6-404(b) (2010). She places particular emphasis on Father's refusal or inability to encourage the boys to have a relationship with Mother. Mother contends that the proof actually shows it was Father who

poisoned the boys against her. Father contends, as he did in the trial court, that Mother brought this all on herself by having the affair.

B.

Before dealing with the merits of the parties' respective arguments, we will first identify the standard for reviewing the permanent parenting plan entered by the trial court. The paramount concern in establishing a permanent parenting plan is the best interest of the children. *See* Tenn. Code Ann. § 36-6-401(a). The details of permanent parenting plans are typically left to the discretion of trial courts; thus, the ultimate question as to who should be the primary residential parent on appeal is whether the trial court abused its discretion in its selection. ***K.B.J. v. T.J.***, 359 S.W.3d 608, 613, 616-17 (Tenn. Ct. App. 2011). The trial court's discretion is not unbounded. ***Id.*** In choosing the primary residential parent, the court engages in a "comparative fitness" analysis. ***In re C.K.G.***, 173 S.W.3d 714, 732 (Tenn. 2005). The court is obligated to consider all of the relevant factors listed in Tenn. Code Ann. § 36-6-404(b). "It is our job in reviewing for an abuse of discretion to see that the trial court's order is made with due regard for controlling law and based on the facts proven in the case." ***K.B.J.,*** 359 S.W.3d at 616. Thus, if the evidence preponderates against the trial court's findings of fact upon which it bases it determination, or simply focuses on facts which should not really matter while ignoring those that really do matter, the court may be found to have abused its discretion. ***Id.*** A slightly different way of phrasing the abuse of discretion standard is that "[a] trial court fails to exercise its discretion properly when its decision is not supported by the evidence, when it applies an incorrect legal standard, [or] when it reaches a decision which is against logic or reasoning that causes an injustice to the party complaining." ***Owens v. Owens***, 241 S .W.3d 478, 496 (Tenn. Ct. App. 2007) (*citing* ***Biscan v. Brown***, 160 S.W.3d 462, 468 (Tenn. 2005)). Where the trial court makes specific findings of fact, we presume those findings to be correct unless the evidence preponderates against them. Tenn. R. App. P. 13(d); ***K.B.J.***, 359 S.W.3d at 613. If the trial court does not make specific factual findings, there is no presumption accorded to the absent findings; we must conduct our own review of the record to determine the controlling facts by a preponderance of the evidence. ***Curtis v. Hill***, 215 S.W.3d 836, 839 (Tenn. Ct. App. 2006).

C.

The guardian ad litem recommended that Sarah reside with Mother, based on his observation that she is a good parent who has taken responsibility for her mistake and is willing and able to encourage Sarah to have a relationship with Father. As to the boys, the guardian testified that he seriously considered recommending that they be placed in foster care because he fears that the boys will flee if they are forced to reside with Mother. He

-13-

testified that he came to the conclusion that the boys should remain with Father, but only if they receive appropriate counseling and only if Father's negative comments cease.

Except for the hope that things would improve after entry of a permanent parenting plan, the record fully corroborates the guardian's observations and recommendations. Numerous witnesses testified that Father either told them about Mother's affair or showed them the emails between Mother and Mr. S. Mother testified that Father often belittled her in front of the children and shamed her about the affair. Thinking that Father's behavior was so bizarre that nobody would believe her, she recorded numerous conversations, most of which appear to be made in the hearing of the children. When questioned about the recorded conversations, Father claimed he could not recall them. The strength of Father's venom and the effect it has had on the children cannot be appreciated without considering at least a smattering of the conversations.

<u>March 28, 2009</u>

Paul [Father]: You're a liar.

Angie [Mother]: You are.

*   *   *

Paul: They don't care about you.

Alex [youngest son]: Quit fightin'.

Angie: Thank you, Alex.

Alex: You're the one that's stupid.

*   *   *

Alex: Stop saying words, Momma. . . .

Paul: He's scared to death of you.

Angie: I'm not leavin' you. . . .

Paul: He's wantin' you to leave him.

-14-

                 *   *   *

Alex: I do.

Paul: Tell her.

                 *   *   *

Alex: I do want you to leave.

                 *   *   *

Angie: You love me, and I know it.

Alex: No, I don't.  Do I dad?

                 *   *   *

Angie: You've just been put in the middle, Alex, and that's sad.

Alex: Uh, uh.  Ain't putting us in the middle.

Angie: I'm not either.

Alex: Bullcrap.

                 *   *   *

Paul: Open your eyes, Angie.

Angie: My eyes are wide open, Paul.

Paul:  If they are you would leave.

Angie: I'm not leavin' my kids.

Paul: Yeah, you have.

-15-

<u>Date unknown</u>

Paul: I'm going to shame you.

Angie: You're going to shame me. Okay.

Paul: You're going to shame yourself.  How's that?

<u>August 14, 2009</u>

Angie: Hey Alex.

Paul: You can ask them.

Alex:  Daddy.

Angie: I love you Alex.

Paul: How did you know she had a boyfriend, because you seen her?

Alex: Because she was talking on the phone with him.

Paul: And you seen her coming out of the apartment[?]

Alex: Yeah.

Paul: Right there you go.

*   *   *

Paul: You never call them.  You never call 'em.

Angie: I do too.

*   *   *

Paul: The phone's in the trash.  It's unhooked from the pole. . . .
I went out there and cut the wires I ain't paying for the phone.

-16-

\* \* \*

Angie: You never paid for it Paul, it's in my name and I paid for it.

## October 30, 2009

Paul: If you can't see Angie that [Sarah] needs help then there's something wrong with you.

Angie: She needs help.

Paul: And what you've done to these boys and you wonder why they'll never talk to you and it would be sad to have to make 'em. That would be sad, because it'll never happen.

Angie: It'll never[?]

Paul: It will never. They will never. They've done said they will never. . . .

\* \* \*

Paul: Your poor ole sister has never one day in their life offered to do anything for 'em until now.

Angie: She has always been there Paul.

\* \* \*

Alex: That's a lie.

Paul: I don't know anybody that would say that Angie except some of your people.

Angie: What did you want to call back and talk to [me] about?

Paul: I want to know what in the _ _ _ _ . I want the truth. And you know what? If you was real and you meant what you said to God and you loved your family –

Angie: I love my kids, Paul.

Paul: If you'd changed. Change you _ _ _ _ life. Cause they don't love you. And you need to realize that. Because you have hurt them beyond repair, I think. . . .

Angie: You feel sorry for me?

Paul: . . . Well, yes, I do. Cause we had a good family and why in the _ _ _ _ you'd – would want to sleep with somebody when you know'd he'd _ _ _ _ _ _ all them other girls. . . .

Paul: And that's pretty _ _ _ _sorry.

Angie: What did you want to talk about?

Paul: Well, see. Right there, you can't even face the truth, Angie.

Angie: That's now what you called to discuss. You just always go into all that Paul.

Paul: Well, by God, you ain't sorry for what you've done. You don't care about your family.

Angie: I love my kids.

Paul: Bull_ _ _ _, Angie. You don't love your kids.

* * *

Paul: You know [what]?  The kids are a blessing, Angie, and you don't deserve that right now.  I'm sorry but you don't.

Angie: I don't deserve my kids[?]

Paul: Not right now, you don't.  Not the way you are.  They don't deserve to be around a cheater. . . . For what you have done to Sarah since August 10th, the boys despise you even more.

Angie: I haven't done anything to Sarah.

Paul: Bullcrap, Angie. . . .

Paul: You can thank your sister, that's what you can do.  And if they's anyway that I can get her job, she's gone too. . . .

Paul: Now, you, you've pushed long enough, Angie.  You've messed with fire.  And I'm tellin' you, you shouldn't be associated with Laughlin Hospital. . . .

Angie: Is Karter playing basketball in Johnson City?

Paul: And you can't deny that, and you won't deny it cause you'll be a liar again and you know that.

Angie: Is Karter playing ball in Johnson City?

Paul: What's it matter?

*    *    *

Angie: Are you done yet?

Paul: You need to change your life, Angie, if you love your kids, and if you don't, you just need to leave them alone.

*    *    *

-19-

Paul: And get away from your _ _ _ _ sorry _ _ _ sister and change your _ _ _ _ life.  Cause that's the only way you're ever gonna talk to them.  And that's not me telling you that. . . . Because they've done made up their mind.

* * *

Paul: I can't help what you've done to them.  You've done it. You've made your choice by sleeping with him.  And lying to me.  And not only me, you lied to them.  I mean, you need to think about it.

<u>December 22, 2009</u>

Angie: Karter you couldn't see.

Alex: No you [are a] liar.

* * *

Angie: Don't talk to me like that.  Your Daddy shouldn't allow you to talk like that. . . .

Alex: He don't.

Paul: I wouldn't to somebody.

Angie: . . . To somebody what's that mean?  I'm his mom.

Alex: What does that mean.  You're mean to him.  Yeah I've learned something about you.

Paul: Oh.

We have read the testimony of the boys, recorded in chambers, and it is obvious that they have adopted the views of Father.  They talk about how they do not love their mother because she does not ever do anything for them.  They call her a liar.  They talk about how their mother is trying to harm Father, and turn their sister against them.

-20-

D.

We fully recognize that Father, on occasions, lied to the trial court. One example of this is Father's denial of a farming partnership with his parents despite (1) notes signed by him and his parents, (2) a check written by Father on the family's account in the approximate amount of $25,000 to purchase a part interest in a breeding animal, and (3) his own father's testimony that Father is paid a portion of income from the sale of pure-bred animals. Another example is Father's failure to produce any documents in written discovery, followed by his agreement to provide them as late exhibits to his deposition, followed by his testimony at trial that, for an unexplained reason, the documents no longer exist. His refusal to produce any documents is obviously related to his focus on blaming Mother for all the family's spending, while he alone handled the family finances and managed to dispose of (1) at least $25,000 in gambling winnings, (2) over $40,000 related to income from a tobacco allotment, (3) proceeds of a $50,000 loan signed with his parents, (4) $20,000 from the sale of a parcel of property, and (5) over $100,000 in payments for livestock in which the court found he had a partnership interest. Still another example is Father's testimony that he could not recall saying numerous things that Mother recorded and proved to have been said through the collective exhibit of recordings. Transcripts of the recordings were received into evidence by agreement. Yet another example is Father's denial of doing anything to alienate the children from Mother, contrary to volumes of evidence that he did. Still another example is Father's praise of Mother in the notes he wrote to try to regain her love compared to his later pronouncements – when she spurned him – that she was a worthless, lazy, liar who did not even love her children.

It does not escape our review that one witness, in testimony elicited during cross-examination by Father's counsel, testified that Father has a reputation for lying. When pressed, the witness was able to provide specifics to support his knowledge of Father's reputation to the effect that if Father's lips are moving, he is lying. Another witness called by Father admitted on cross examination that he himself had questions about Father's truthfulness, having been told things by Father that he, the witness, did not believe to be true. We further note that the trial court did not make any explicit credibility determinations in this case. However, it is obvious the court did not believe Father's denial of having any partnership with his parents.

We are confident that, as the guardian ad litem testified, if Father had worked as diligently at encouraging the boys to visit with Mother and toward meaningful participation in counseling as he has at coaching them in various extracurricular activities, some progress would have been made toward re-establishing a relationship with Mother. It is clear that he has the ability to influence the boys when and if he wants to influence them.

We note that factors two and seven of Tenn. Code Ann. § 36-6-404(b) seem to weigh against making Mother the primary residential parent of the boys. There is obviously a weakening of the bond between Mother and the boys. Mother deserves some credit for weakening the bond in the first instance by spending time with her lover rather than the children, but the record clearly shows that Father has played on that weakness from the day of separation to present.

Our focus must be on the best interest of the children. Tenn. Code Ann. § 36-6-401(a). Presently, their best interest is served by leaving them with Father. However, something must be done to improve the family relationships at stake, *i.e.*, the relationship among the siblings; the relationship between Mother and her sons; and the relationship between Father and daughter. With this in mind, we modify the permanent parenting plan to the extent it refers to "appropriate, professional counseling" by substituting our own language for that provision. On remand, the trial court is directed to hold a hearing on the subject of family counseling. At that hearing, the court shall appoint appropriate therapist(s) and charge them with developing a comprehensive counseling program and therapy sessions to address the mending of the three relationships identified in this paragraph. The goal of the therapy sessions shall be the attainment of healthy family relationships. Counseling shall be undertaken by competent therapists to be selected by the trial court. Said counseling shall continue for as long as necessary but only during the minority of a child or the children. Both parents and all three children shall participate as directed by the therapist(s). Should the therapist(s) determine that one or more of the two adults and three children are not participating in good faith in the therapy sessions, he or she shall report same to the court and the court is directed to take such action in response to the report as it deems appropriate, in the exercise of the court's discretion. The parties shall share equally in the cost of the therapy.

Our court has recognized that "[s]eparating siblings is a drastic remedy." **Shofner v. Shofner**, 181 S.W.3d 703, 717 (Tenn. Ct. App. 2004). Siblings are to be separated only if extraordinary facts in the case require it. We believe that the three damaged relationships outlined above can be repaired if the parties and their children enter into therapy with open minds and hearts.

E.

To summarize, we hold that, at the present time, the evidence does not preponderate against the trial court's respective awards of primary residential parent status in this case. However, we modify the permanent parenting plan as set forth above.

IV.

Mother argues that the trial court erred in making the child support award retroactive to the date of the separation, rather than the date of the trial court's decision. Her argument is to the effect that she contributed toward providing for the children's needs between the date of the separation and the trial, and that she is paying support for children that she is not being allowed to see. Father argues that the Guidelines require the award to be effective as of the date of separation unless there is a basis for deviation from the Guidelines. Father is correct. *Carroll v. Carroll*, No. M2012-00111-COA-R3-CV, 2013 WL 395987 at *3 (Tenn. Ct. App. M.S., filed Jan. 30, 2013) (citing Tenn. Comp. R. & Reg. 1240-2-4-.06(1)(b)(1)). The trial court found that there is no reason to depart from the presumptive award as determined by the Guidelines. We agree with Father that the evidence does not preponderate against the trial court's refusal to allow a deviation from the Guidelines. A parent's child support obligation is not relieved just because someone interferes with his or her parenting time. *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005); *but see*, *In re T.K.Y.*, 205 S.W.3d 343, 355 (Tenn. 2006)(granting "equitable" relief to a non-custodial parent based on "unique" facts).

V.

Mother's final argument is that the trial court erred in making her responsible, in the event of foreclosure on the marital home, for one-half of any deficiency left on the note. Father argues that the trial court is correct because he is still left in financial ruin. We agree with Mother for two reasons. First, the requirement that Mother pay a deficiency related to the marital home is, in this case, inconsistent with the court's award of the marital home to Father along with the debt. Another reason for our holding is that Father has successfully hidden his financial dealings except to the extent Mother was able to recreate them by gleaning through records that she could access. Through Mother's efforts, and despite Father's concealment, we now know that Father handled approximately $200,000 in marital assets, some of which involved gambling, that he could only explain by his unsubstantiated testimony that he deposited the monies in the bank. Accordingly, we hold that the trial court erred in holding that Mother is responsible for paying any deficiency on the marital home. We realize that Mother may be directly liable to the holder of the note, but our decision has nothing to do with her obligation to a non-party to these proceedings. We are concerned here with the rights and obligations between Father and Mother with regard to the marital home Father was awarded.

## VI.

The judgment of the trial court is reversed in part, modified in part, and affirmed in part. That part of the judgment making Mother responsible for a portion of any deficiency in the event of foreclosure is reversed. As between Mother and Father, Father alone is responsible for any debt regarding the marital residence. Father shall hold Mother harmless with respect to this debt. The permanent parenting plan is modified to provide for family counseling as set forth in this opinion. Except as reversed or modified, the judgment of the trial court is affirmed. Costs on appeal are taxed equally to the parties. This case is remanded for further proceedings consistent with this opinion.

_____
CHARLES D. SUSANO, JR., PRESIDING JUDGE