IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 1, 2020

## ASHLEY JOELL LINDSLEY v. PHILIP J. LINDSLEY

**Appeal from the Chancery Court for Williamson County**
**No. 43580    Joseph A. Woodruff, Judge**

———————————————————

### No. M2019-00767-COA-R3-CV

———————————————————

This is an appeal from a divorce proceeding involving a short-term marriage with minor children.  In conjunction with its divorce judgment, the trial court designated the mother as the primary residential parent, allowed her to relocate to Mississippi, and awarded her both transitional alimony and alimony in solido.  Father now raises several issues for our review on appeal.  While we affirm the trial court's judgment pertaining to the parties' parenting plan and its determination about the children's best interests, we vacate a component of the in solido award given to the mother in a purported attempt to equalize the division of the marital estate.  We further vacate the award of transitional alimony and remand the case for that issue to be reconsidered by the trial court.  The balance of the judgment is affirmed.  The mother's request for an award of attorney's fees on appeal is granted.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Vacated in Part and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and W. NEAL MCBRAYER, JJ., joined.

Selena L. Flatt, Cookeville, Tennessee and Mary Frances Parker, Charlotte, North Carolina, for the appellant, Philip J. Lindsley.

Casey Ashworth, Franklin, Tennessee, for the appellee, Ashley Joell Lindsley.

## OPINION

## BACKGROUND AND PROCEDURAL HISTORY

Ashley Lindsley ("Mother") and Philip Lindsley ("Father") were married in Davidson County, Tennessee in September 2012.  They have three minor children.  The

parties' oldest child was approximately three years old at the time of their marriage.

When the parties originally met, Mother was living in Mississippi where she has family. According to her testimony, she did not initially marry Father when their oldest child was born because she first "wanted to make sure that his partying lifestyle was behind him." At that time, Father was working as a manager at a store called Auto House. He would later run Titan Motoring LLC ("Titan Motoring"), a business specializing in the electronic customization of cars. Although Titan Motoring was formally organized by Mother as the principal, Mother left the operation of the business up to Father. According to Father, he and Mother agreed that Titan Motoring would be in her name originally, but that she would later transfer her interest to him. This apparently never happened, although Father was eventually designated as Titan Motoring's registered agent.

The business started out as a mobile audio installer, but it eventually grew to occupy an 8,000 square foot state-of-the-art facility performing various automotive customization services, including car audio and video systems upgrades and full frame-off restorations. In the early stages of the marriage, the parties lived off of Mother's salary as a dental hygienist, and any money made from Titan Motoring was put back into the business. Although Mother became a homemaker in 2013, she went back to work part-time in 2017. Mother testified at the eventual trial of this matter that she wanted Titan Motoring to grow into a company that could "be the breadwinner of the family." There is no dispute in this litigation that the parties' interest in Titan Motoring is marital property.

According to the record, the marriage was marked by multiple indiscretions on Father's part, including instances of drug use and adultery. Although Mother filed for divorce in October of 2014, the parties attempted a reconciliation in 2015 after Father emailed Mother and expressed his love for her and acknowledged his mistakes. When Father testified at trial, he confessed that when he had been in a relationship with one of his paramours, he had been on a lot of drugs, including using cocaine, amphetamines, and marijuana. He further acknowledged that he was an addict and testified that at a previous point in his addiction he had used three to four grams of cocaine per night.

In the summer of 2017, Mother discovered that Father had fathered a child outside of the marriage. Later, in the fall of the same year, Father chose to leave the marital residence and move into a condominium in downtown Nashville. The parties' divorce trial occurred over three days in March 2019.

The proof at trial covered several issues, including the valuation of Titan Motoring, the parties' respective financial conditions, Mother's desire to relocate to Mississippi with the children, and, as alluded to above, Father's various affairs and drug use. Although many issues were hotly contested between the parties, the trial court was informed of a number of stipulations at the opening of trial, including that Mother was entitled to a divorce on the grounds of adultery and inappropriate marital conduct and that Father would

pay Mother's reasonable attorney's fees.

Throughout the litigation of this case and in discovery, Father was less than forthcoming about certain factual matters. For instance, Mother had not learned about a DUI arrest of Father's, one that occurred in 2017, until just days before trial. [1] As Mother's counsel shed light onto Father's shifting accounts on various topics and initial lack of truthfulness at certain points from discovery, the trial judge actually interjected, stating, "[Mother's counsel], I appreciate what you're doing but let me just say, and [Father's counsel], just so you know, I find that husband has been thoroughly impeached."

In the dental hygienist position, she had at the time of trial, Mother received no benefits and was only paid if a patient was in her chair. By way of example, she claimed that she could work a full day but only get paid for four hours if she only saw four patients. Mother also detailed her unsuccessful efforts to seek other employment, and she attributed her difficulty in locating other employment to online postings directed by one of Father's paramours, wherein Mother was accused of behavior the trial court would later note "the repetition of which . . . would perpetuate the harm [the paramour's] perfidy has already inflicted." Mother testified that she had a full-time position with benefits available in Mississippi through her brother-in-law who was a pediatric dentist.

During the course of her testimony, Mother detailed Father's failures to help her out with the children, and she explained that, whereas she always wanted him to spend more time with the family, that had been a topic of continued disagreement. Mother stated that Father spent "[v]ery little" time with the children when they were living together, and exercised only 99 out of 114 days of his parenting time in 2018. According to Mother, when Father had the children, he routinely brought them home early.

Regarding the children's schooling, Mother stated that Father had gone to a few open houses and parent-teacher conferences in 2018, but he had not been to any prior to that. She further testified that Father does not help the children with their homework or projects. At trial, she submitted evidence where Father had called her a "great Mom" and thanked her for the work she had put into helping one of their children with school.

Mother testified that she had promoted Father to the children, including him in prayers and telling the children how much fun they are going to have when they go to spend time with him. She claimed that she helped the children make phone calls with Father but stated that, in contrast to her promotion of Father to the children, he did not return the favor. She further testified that, at times, Father had not let the children call her when they were with him "as a form of punishment."

---

[1] Although the proof showed that Father had lost his license for a year following this arrest, he had nonetheless continued to drive during this period, a point he acknowledged.

As for the strength of the relationship Father had with the children, Mother stated that it was "okay," testifying specifically as follows: "There's not been a deep connection established because he's been absent for most of them. I mean they have fun with their father when he takes them to Chuckie Cheese and Trampoline Park but it's very strained on our oldest son's relationship with him." Mother testified that she believed Father loved their children, "the best way he knows how to," but that other things such as "women and socializing and drinking and partying" had been more of a priority for him.

Mother testified that Father had been violent towards her in front of the children and described an incident where Father had thrown her "up against the passenger car window with a choke hold position with one hand, his right hand, his left hand on the steering wheel." Mother claimed that she reached for her phone and indicated that she was going to call 911, but Father grabbed the phone and tossed it out onto the interstate. Mother testified that Father had been arrested following this episode. According to her, Father later admitted that he had been using drugs at the time of this incident, although she had not known it at the time. Father did not dispute this assault, although he did attempt to deny the assertion that he was on drugs at the time notwithstanding previous representations by him to the contrary.

In Mississippi, in addition to having a job available, Mother testified that she also had a support system through her family, who would be able to help with childcare and provide other assistance. She also testified that she could get "a lot of home" there for considerably less than she could in Brentwood or Franklin; in fact, she testified that she could obtain "a very nice home in the 200's, 250's."

Mother expressed her desire to enroll the children in a private Christian academy if she relocated to Mississippi. When asked if she would be solely responsible for tuition if Husband agreed to allow the children to attend that school, Mother stated as follows: "I have recently discovered that I qualify for financial aid for that and my parents also told me that they would pick up any expenses after that." She later indicated in her testimony that if she was allowed to relocate and enroll the children in that school that it would not be at the expense of Father. She testified that her cost of childcare in Mississippi would be approximately $300 per month.

Although Mother asked for alimony, she testified that her overall needs would be much less if she moved to Mississippi. She sought an award of transitional alimony for a five-year period. Father acknowledged at trial that he believed Mother "needs limited alimony if she moves to Mississippi."

Father proposed that Mother be the primary residential parent, and he agreed that Mother, who in his eyes was a good mother, had been the children's primary caregiver. He also testified, however, that he had recently been able to spend a lot more time with the children, as opposed to previous years when his business was smaller. He said this was

- 4 -

true "especially in 2018." In that year, he claimed, he had a lot more time to break away from work due to added employees. He stated that he believed he would have more time to spend with the children as time goes on.

Concerning the valuation of Titan Motoring, testimony was offered by Tom Price, CPA, Mother's expert forensic accountant. Mr. Price testified that he found the documents given by Father to be incomplete and that certain income to the business had been underestimated in 2017 due to treatment that had been given to expenses for a professional football suite and tickets. Moreover, Mr. Price testified that his efforts to value the business had been complicated by the fact that the company did not keep its books in accordance with generally accepted accounting principles. Concerning a loan to Titan Motoring with debt in the approximate amount of $116,000, Mr. Price testified that his valuation had originally been based on the understanding that the loan had a zero balance. He acknowledged he had later learned there was still a balance on the loan and stated that the "amount that is owed . . . should be deducted from our value." His trial testimony was clear that, when taking the balance due on this loan into account, the value of Titan Motoring was $256,476.

On April 11, 2019, the trial court entered a thorough "Memorandum and Order," wherein the court awarded Mother a divorce. In stating that some of the disputed issues in the case hinged on credibility determinations, the court noted that whereas "[Mother] was a credible witness whose testimony was entitled to great weight," the same was not true for Father. In contrast to Mother, the court noted that Father was "often argumentative and equivocal." The court held that his "demeanor and emotional affect while testifying were inconsistent with those expected of a person attempting to testify truthfully." In addition to awarding Mother a divorce, the trial court divided the marital property, awarded Mother transitional alimony in the amount of $2,500 per month for sixty months, awarded Mother $216,800 as alimony in solido, and ruled that Mother's proposed parenting plan contemplating her relocation to Mississippi should be adopted. The in solido award given to Mother was ordered to be paid in installments, and notably, the record reflects that a sizeable component of the in solido award, namely $75,000, was intended to serve as an equalizing distribution of the marital estate. In its order, the court noted that both parties were 38 years of age. Following the denial of a motion to alter or amend which was subsequently filed by Father, this timely appeal ensued.

## ISSUES PRESENTED

In his appellate brief, Father raises three primary issues for our review. First, he challenges the trial court's division of the marital estate. Second, he challenges the alimony awarded. Third, he asserts error in the trial court's decision to allow Mother to relocate to Mississippi with the parties' children.

Mother opposes Father's contentions as to each of these issues. For her own part,

she independently asserts that she should be awarded her reasonable attorney's fees on appeal.

## DISCUSSION

"The dissolution of a marriage requires the courts to engage in the orderly disentanglement of the parties' personal and financial affairs." *Anderton v. Anderton*, 988 S.W.2d 675, 679 (Tenn. Ct. App. 1998). Before the financial aspects of a divorce are decided, status issues such as the entitlement to a divorce and custody arrangements must be adjudicated. *Id.* Here, no issue is raised as to the granting of the divorce. Parenting issues, however, have been presented for our review. We thus focus our attention on those matters first before delving into the financial issues.

### *Parenting Issues*

Although Father does not dispute that Mother should be the primary residential parent, he does assert that the court erred in allowing her to relocate to Mississippi. Along the same lines, he further claims that the adopted parenting plan is not in the children's best interests. In his view, it does not properly maximize both parents' parenting time.

Despite the fact that Mother's relocation to Mississippi is a prominent issue of concern to Father in this case, the parental relocation statute, Tenn. Code. Ann. § 36-6-108, is not itself applicable. In several cases, we have held "that the standards in the Relocation Statute should not be applied when the court is making the initial custody decision or parenting arrangement." *Nasgovitz v. Nasgovitz*, No. M2010-02606-COA-R3-CV, 2012 WL 2445076, at *5 (Tenn. Ct. App. June 27, 2012). The proper manner to address the relocation request and parenting issues is a consideration of the child's best interests. *Id.* at *6-7.

In his appellate brief, Father complains of the entered parenting plan by asserting that the "trial court abused its discretion because it failed to make findings of fact that the parenting schedule it adopted was in the children's best interests." This is simply incorrect. The trial court specifically concluded that Mother's proposed parenting plan, "prepared in contemplation of relocation to Mississippi," was "in the best interest of the children," and prior to that conclusion, the court engaged extensively with the facts of the case and the best interest factors codified at Tennessee Code Annotated section 36-6-106.[2] In relevant part, the trial court stated as follows:

> Child custody determinations in divorce proceedings are to be made

---

[2] When fashioning a parenting plan, trial courts are required to consider the factors in Tennessee Code Annotated section 36-6-106(a)(1)-(15) if the limitations of section 36-6-406 are not dispositive of the child's residential schedule. Tenn. Code Ann. § 36-6-404(b).

on the basis of the best interest of the child, taking into account all relevant factors including those specified in Tenn. Code Ann. § 36-6-106(a). The parties agree Wife should be the primary residential parent. The principal disagreement between the parties is whether Wife will be allowed to relocate with the parties' children from Tennessee to Mississippi. The issue driving Wife's desire to move back to her hometown of Brandon, Mississippi is the character assassination Wife has suffered at the hands of Husband's former lover and her allies. Armed with a keyboard and access to the internet- a phenomenon existing in an electronic universe with a shelf-life akin to plutonium-the jilted mother of Husband's child K, vented the spleen of her rage upon Wife, accusing a wholly innocent person of wrongs the Court will not dignify with repetition.

As a result, Wife has encountered great difficulty obtaining full-time employment in her field in Middle Tennessee. She has a full-time job as a dental hygienist waiting for her in Brandon, Mississippi. The cost of living in Brandon is materially less than in Williamson County. Wife grew up in Brandon. Her parents, recently retired, are moving to Brandon from their current residence in Granada [sic], Mississippi. In Brandon, Wife and her children will live in close proximity to Wife's sister, and other extended family. Wife plans to apply for the children to be enrolled in a private Christian academy in Brandon, from which Wife graduated high school.

Wife has been the primary caregiver to the children. During the marriage, Husband has devoted himself to building the business of Titan Motoring, but has been little more than a passing, recreational figure in the children's lives. To be sure, Husband has done many fun and entertaining things with the boys, especially since the parties separated and he exercised individual residential parenting time. The history of Husband's behavior around the children includes assaulting Wife in their presence, being absent from the home pursuing extramarital affairs, and using illegal drugs. Husband has even gratuitously used social media and the internet to insult Wife, giving little, if any, thought to the effect of such juvenile behavior on his sons.

Since the parties separated, Husband has for the first time, taken a more active role in the children's lives, but the record of his performance of parental responsibilities has been uneven, at best. On cross examination, Wife's counsel proved Husband could not name any of the children's teachers or treating pediatricians. His supervision of homework and preparation for school on nights he exercises residential parenting is best described as inconsistent. On one occasion, Wife became ill during her residential parenting and was unable to transport the children to where they

needed to be. Wife telephoned Husband and asked him to help. Husband replied he was in Chattanooga at a business meeting. In truth, he was in Hawaii with his current paramour. The Court notes that Husband successfully completed the four-hour Parenting Skills Institute Parent Education and Family Stabilization Course on March 17, 2019.

Wife's existing employment schedule, and her anticipated employment schedule after she begins work in Brandon, is more accommodating to her responsibilities as primary residential parent than is Husband's schedule, which often requires him to work six days per week. Affording Wife substantially greater residential parenting days will promote continuity in the children's lives and enhance stability in their home environment.

. . . .

The Court finds Wife's proposed parenting plan [contemplating relocation to Mississippi] . . . to be in the best interest of the children.

(internal footnotes omitted).

Littered throughout the court's discussion above were various footnotes both to the record and statutory best interest factors. Again, Father is simply incorrect that the children's best interests were not considered. Moreover, we find no reason to disturb the trial court's determination that the parenting plan adopted in contemplation of Mother's relocation to Mississippi was in their best interests. The court appropriately placed emphasis on the fact that although Mother had been the children's primary caregiver, Father by contrast had much less of a presence in their lives. Moreover, in juxtaposition to life in Tennessee, Mother's potential rearing of the children in Mississippi not only came with greater employment prospects, it also came with the opportunity for the children to be around Mother's family and a larger support system.

Aside from the fallacious argument by Father that the trial court did not make a best interests determination, he appears to primarily complain that the schedule adopted by the trial court failed to maximize his parenting time and therefore contradicts the policy behind Tennessee Code Annotated section 36-6-106(a). Respectfully, we reject Father's argument on this issue as well. Although the Tennessee Code no doubt now directs trial judges to "order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child," Tenn. Code Ann. § 36-6-106(a), the polestar behind any parenting arrangement remains the best interests of the children impacted. The very statute containing the "maximum participation possible" aspiration make this clear:

In a suit for annulment, divorce, separate maintenance, or in any other

proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child. In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors.

*Id.*; *see also In re Cannon H.*, No. W2015-01947-COA-R3-JV, 2016 WL 5819218, at *6 (Tenn. Ct. App. Oct. 5, 2016) ("The plain language of Section 36-6-106(a) directs courts to order custody arrangements that allow each parent to enjoy the maximum possible participation in the child's life only to the extent that doing so is consistent with the child's best interests."). Indeed, "the 'maximum participation possible' principle does not alter or diminish the trial court's broad discretion in fashioning permanent parenting plans in accordance with the best interest of the child." *Flynn v. Stephenson*, No. E2019-00095-COA-R3-JV, 2019 WL 4072105, at *7 (Tenn. Ct. App. Aug. 29, 2019).

Having reviewed the record transmitted to us, we discern no abuse of discretion here. Although it is apparent that Father wants more parenting time than that available to him under the entered parenting plan, we must again note that it is the children's best interests, not a parent's personal preferences, that control the analysis. Moreover, here it is noteworthy that Father opposes the parenting plan, in part, based on his testimony that he has recently been able to spend more time with the parties' children, *"especially in 2018."* Although Father did eventually take on a more active role in the children's lives, the trial court also noted that his performance of parental responsibilities had been "uneven, at best." That observation is not without great significance in our opinion. Having the children remain in Tennessee and/or awarding Father more parenting time would create a *theoretical* opportunity for more interaction between Father and the children, but the propriety of fashioning a parenting schedule with more time for Father must of course be considered in light of the evidence and the statutory best interest factors. In this regard, although Father emphasizes his greater parental participation in the 2018 year, we observe that he only exercised 99 out of 114 days of his allotted parenting time that year per Mother's testimony. The trial court was fully aware that it was giving Mother "substantially greater residential parenting days." Yet, its order reflects that it was convinced that Mother's "proposed parenting plan order allocating 261 days of residential parenting time to Wife and 104 days to Husband, as well as all other aspects of the proposed plan, [was] in the best interest of the children."

Although Father raises a number of suggestions as to how he believes the parties' parenting plan might be improved, some of his arguments are not supported by any citation to the record. For instance, whereas he criticizes the allocation of the children's Thanksgiving break based upon how the children's school calendar is allegedly structured, no citation reference to the school calendar is actually provided in his brief. Argument

must be supported by citation to the record in order to be countenanced by this Court. *See* Tenn. R. App. P. 27(a)(7) (requiring the argument of the appellant's brief to contain "appropriate references to the record"). In any event, it is not the province of this Court to tweak minor aspects of a permanent parenting plan. Again, such matters are within the trial court's broad discretion. *See Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001) ("It is not the function of appellate courts to tweak a visitation order in the hopes of achieving a more reasonable result than the trial court."); *Maupin v. Maupin*, 420 S.W.3d 761, 770 (Tenn. Ct. App. 2013) (noting that "details of permanent parenting plans are typically left to the discretion of trial courts"). For the foregoing reasons, we affirm the trial court's entered parenting plan.

### *Division of Marital Estate*

In addition to challenging the trial court's ordered parenting schedule, Father takes umbrage at its division of marital property. As to the standards that guide a court's consideration of this issue, we have noted previously as follows:

> When dividing a marital estate in a divorce proceeding, the trial court's goal and duty is to divide the marital property equitably. *Owens v. Owens*, 241 S.W.3d 478, 489–90 (Tenn. Ct. App. 2007) (citations omitted). In seeking to achieve an equitable result, the trial court need not adopt a mechanical approach. *Id.* at 490 (citations omitted). Instead, it should carefully weigh the relevant factors in Tennessee Code Annotated section 36–4–121(c) in light of the parties' evidence. *Id.* (citations omitted). Although the fairness of the trial court "is inevitably reflected in its results," "[a] division of marital property is not rendered inequitable simply because it is not precisely equal[.]" *Id.* (citations omitted).

> The trial court has wide latitude in fashioning an equitable division of marital assets, *Brown v. Brown*, 913 S.W.2d 163, 168 (Tenn. Ct. App. 1994) (citation omitted), and as a reviewing court, we give great weight to the trial's decision. *Bookout v. Bookout*, 954 S.W.2d 730, 732 (Tenn. Ct. App. 1997) (citations omitted). Our role is simply to determine "whether the trial court applied the correct legal standards, whether the manner in which the trial court weighed the factors in Tenn. Code Ann. § 36–4–121(c) is consistent with logic and reason, and whether the trial court's division of the marital property is equitable." *Owens*, 241 S.W.3d at 490 (citations omitted).

> It is well-settled that "[t]rial courts have the authority to apportion marital debts in the same way that they divide marital assets." *Cutsinger v. Cutsinger*, 917 S.W.2d 238, 243 (Tenn. Ct. App. 1995) (citation omitted). In fact, a trial court's division of a martial estate is not complete until it has allocated both the marital property and the marital debt. *Owens*, 241 S.W.3d

at 490 (citations omitted).

*Bewick v. Bewick*, No. M2015-02009-COA-R3-CV, 2017 WL 568544, at *4–5 (Tenn. Ct. App. Feb. 13, 2017).

Here, the court divided the parties' assets after considering the evidence in light of the statutory factors at Tennessee Code Annotated section 36-4-121(c). Although other assets were involved in the court's division, the major marital assets were the marital residence and the interest in Titan Motoring. These assets were awarded to Mother and Father, respectively. Per the trial court's calculations, the overall distribution resulted in Mother receiving 45% of the marital assets with Father receiving 55%. The court specifically noted that the "division of marital assets favors Husband by $75,000 in asset value" and concluded that its alimony in solido award should include an "equalizing distribution" to address this. The trial court's order reflects that $75,000 was included in the in solido award to account for Father's alleged receipt of a larger share of the assets. This equalizing distribution essentially swapped the positions of the parties; indeed, when taking the $75,000 component of the in solido award into account, Mother effectively received approximately 55% of the marital assets *as calculated and valued by the trial court*, whereas Father effectively received 45%.

We would discern no abuse of discretion here in such a division were the trial court's underlying calculations accurate, and ultimately, having carefully reviewed the record, we do not conclude that there was any error committed with respect to how the marital assets and interests were actually divided. We agree with Father, however, that the trial court's initial valuation of the marital assets was in error. We further conclude that, when taking a proper valuation of the assets into account, the awarded $75,000 component of the trial court's in solido award results in an inequitable division of the marital assets.

Father's specific grievance is that his awarded interest in Titan Motoring was significantly overvalued. We agree. The trial court valued that interest at over $370,000, but this was clear error based on the testimony at trial. The trial court appears to have simply overlooked the testimony that was offered as to a certain debt Titan Motoring had in the approximate amount of $116,000. As noted earlier, although Mother's own expert testified that he originally had valued the business based on an understanding that the subject debt had a zero balance, he acknowledged that he later learned there was a balance on this loan and that the "amount . . . owed . . . should be deducted from [the] value." Upon specific questioning by the trial judge concerning the value of Titan Motoring when taking this balance into account, Mother's expert testified, without equivocation, that the value was $256,476.

If the correct $256,476 value of the interest in Titan Motoring is properly considered, we calculate that Mother received approximately 53% of the marital assets, Father 47%. Of course, if the court's $75,000 equalizing distribution is left in place, the

picture changes even more favorably for Mother, resulting in an effective distribution of marital assets as follows: ≈65% for Mother and ≈35% for Father. As to the estate as a whole, the disparity in the distribution appears even larger once the parties' personal marital debts are considered. Father received a slightly greater amount of these debts under the court's distribution.

Again, although we take no issue with the overall distribution of the marital estate in general terms of how the parties' assets and debts were initially allocated, we do conclude that the $75,000 "equalizing" component of the in solido award results in an inequitable distribution for this short-term marriage when considering the factors of Tennessee Code Annotated section 36-4-121(c). As we have noted, the trial court's basis for making a purported equalizing distribution was, in essence, a product of its inaccurate valuation of the interest in Titan Motoring. Therefore, we vacate the $75,000 component of the in solido award which was intended to serve as an equalizing distribution.

### *Transitional Alimony Award*

In addition to the $75,000 component of the in solido award which was given to Mother in an attempt by the trial court to equalize the distribution of the marital estate, Father challenges the court's transitional alimony award on several grounds. As discussed below, we agree with Father that the amount of Mother's transitional alimony should be modified.

"There are no hard and fast rules for spousal support decisions." *Owens v. Owens*, 241 S.W.3d 478, 493 (Tenn. Ct. App. 2007). Indeed, a trial judge has "broad discretion to determine whether spousal support is needed and, if so, its nature, amount, and duration." *Id.* Thus, although it is true that alimony awards are by no means immunized from appellate scrutiny, considerable deference is given to the trial courts:

> [A]ppellate courts are generally disinclined to second-guess a trial court's spousal support decision unless it is not supported by the evidence or is contrary to the public policies reflected in the applicable statutes. Our role is not to fine tune a trial court's spousal support award, but rather to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable.
>
> . . . .
>
> Initial decisions regarding the entitlement to spousal support, as well as the amount and duration of spousal support, hinge on the unique facts of each case and require a careful balancing of all relevant factors, including those identified in [Tennessee Code Annotated section] 36-5-121(i). Among these factors, the two that are considered the most important are the disadvantaged

- 12 -

spouse's need and the obligor spouse's ability to pay. Of these two factors, the disadvantaged spouse's need is the threshold consideration.

*Id.* at 493-94 (internal citations omitted).

The court's analysis here reflects that it considered the factors codified at Tennessee Code Annotated section 36-5-121(i), but we agree with Father that it abused its discretion with respect to the amount of the transitional alimony award. We have no concerns about the court's general conclusion that Mother requires some assistance to aid in her transition to a post-divorce reality, and we find no basis to tweak the duration of the period the court concluded that Mother was entitled to such assistance.

In this respect, notwithstanding our ultimate conclusion below that the transitional alimony award must be modified as to its amount, we do regard some of Father's suggested arguments to be completely disingenuous. In his brief, Father asserts that "wife testified in her deposition that she would not have a need for alimony if she were allowed to move to Mississippi." Although it is not precisely clear to what end Father references this supposed fact, ostensibly it is offered in support of his position that the duration of transitional alimony should be shortened, because Father did testify at trial that Mother *would need* some alimony if she moves to Mississippi. Regardless of the exact nature of Father's reliance on this supposed statement,[3] his reference to it in his appellate brief is spurious. Mother never disclaimed a need for alimony in her deposition, a point that was made clear at trial when her deposition was read into the record.

Turning to the issue of the amount of the transitional alimony award, we observe that the trial court ruled as follows as it pertained to Mother's financial needs:

> Wife testified she anticipates a monthly deficit of expenses against her income if she remains in Tennessee in the amount of $7,395. By relocating to Mississippi, Wife will increase her monthly income and reduce her living expenses. Wife projects her monthly deficit of expenses against income in Mississippi will be $2,364. Wife testified she intends to enroll the children in private school in Brandon, and that she intends to pay for their tuition; however, Wife did not include private school tuition for her children in her projected expenses after moving to Mississippi. Wife will be receiving child support. Nevertheless, taking into account the cost of private school tuition, an increase in Wife's projected income deficit is reasonably foreseeable. Therefore, the Court finds Wife should be awarded transitional alimony in the monthly amount of $2,500.

---

[3] It also may be referenced to support his contention that the amount of transitional alimony should be lowered. Although the amount of transitional alimony should be modified as discussed herein, it should not be modified on the basis of this supposed statement.

(internal footnotes omitted).

In his brief, Father raises a number of concerns about the trial court's analysis. The first issue relates to the trial court's consideration of private school tuition costs for the children. Father contends that such consideration was an abuse of discretion. In relevant part, he argues that "the parties' children had always attended public school, the children were receiving financial aid, and the wife was not requesting any contribution from the husband." He further argues that "the record is completely devoid of the private school tuition cost and how much, if any, the wife would be paying each month."

"A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Bounds v. Bounds*, 578 S.W.3d 440, 446–47 (Tenn. Ct. App. 2018). Here, the trial court essentially imputed certain private school expenses to Mother in the absence of any proof that she would incur any. Mother, in fact, testified that she qualified for private school financial aid and stated that her parents had advised her that *they* would pick up any expenses after that. Mother's testimony further indicated that she was not requesting any contribution from Father with respect to the cost of private school. The trial court's decision to increase the calculation of Mother's alleged needs to account for private school tuition was therefore error.

We also agree with Father that the trial court's determination of Mother's needs failed to properly account for her receipt of child support. The law is clear that such support should be considered incident to a determination of need for alimony. *See Scherzer v. Scherzer*, No. M2017-00635-COA-R3-CV, 2018 WL 2371749, at *16 (Tenn. Ct. App. May 24, 2018) ("[C]hild support income should be considered in conjunction with all of Wife's financial assets when determining Wife's need for alimony."). Mother states on appeal that the trial court's order mentions her receipt of child support "while discussing alimony." This is technically true, as the court's order does reference that she will be receiving child support. Yet, the trial court failed to properly take the receipt of that support into consideration.[4] It is apparent that the trial court used Mother's income and expense statement as the baseline for her demonstrated needs, noting that her projection of "monthly deficit of expenses against income in Mississippi will be $2,364." While there is certainly no error in the court's decision to use that figure as a baseline for Mother's needs, the figure

---

[4] Because the trial court did not show its math as to the amount of private school tuition expenses it was considering, one could arguably construe its broad phrasing to conclude that the court did take proper account of the awarded child support but also considered there to be several thousand dollars of offsetting tuition expenses per month. ("Wife will be receiving child support. Nevertheless, taking into account the cost of private school tuition, an increase in Wife's projected income deficit is reasonably foreseeable. Therefore, the Court finds Wife should be awarded transitional alimony in the monthly amount of $2,500."). Even assuming such a calculation was made by the court, we have already noted that the court erred in including the cost of private school tuition in its calculations.

must be considered in its proper context. At trial, upon questioning from the trial court, Mother's counsel agreed that her income and expense statement *did not* take child support into account.

Mother was awarded child support of $2,071 per month. When that amount is considered in connection with Mother's income and expense statement, as is necessary for a full picture of Mother's financial needs, it is clear that Mother's needs are significantly lower than calculated by the trial court. As such, we vacate the court's transitional alimony award and remand the issue for reconsideration. The disadvantaged spouse's need is, as already noted, the threshold consideration when a court makes a decision pertaining to alimony. *Owens*, 241 SW.3d at 494. This factor must be properly considered by the trial court in the exercise of its discretion, without reference to private school expenses but with proper reference to Mother's receipt of child support. We are mindful of the fact that time does not stand still, and we leave it to the trial court's discretion as to whether it chooses to reopen the proof on this issue.

### *Appellate Attorney's Fees*

In closing, we turn to Mother's request for appellate attorney's fees. The decision to award attorney's fees on appeal is a discretionary decision. *Cain-Swope v. Swope*, 523 S.W.3d 79, 101 (Tenn. Ct. App. 2016). In this appeal, Mother successfully defended Father's efforts to reverse the entered parenting plan. Moreover, as discussed herein, Mother was required to defend against several of Father's arguments on the issue which were without any basis in the record. We, therefore, find it appropriate to award Mother her reasonable attorney's fees for this appeal. The amount of Mother's award should be calculated by the trial court on remand.

### CONCLUSION

For the reasons stated herein, we affirm the trial court's parenting plan but vacate a component of the court's in solido award to Mother. Further, the transitional alimony award is vacated, and the issue is remanded for further consideration by the trial court consistent with this Opinion. To foster clarity between the parties, the trial court should also enter an order designating the amount of Father's structured payments relative to the in solido award in light of our determination that the "equalizing" distribution component of that award should not be included in the total sum previously awarded. The balance of the trial court's judgment is affirmed. Mother's request for an award of attorney's fees on appeal is granted.

_____
ARNOLD B. GOLDIN, JUDGE