IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 9, 2021 Session

## MICHAEL CHARLES SMALLBONE v. JENNIFER ELIZABETH SMALLBONE

**Appeal from the Chancery Court for Williamson County**
**No. 47448    Joseph A. Woodruff, Judge**

———————————————————

**No. M2020-01556-COA-R3-CV**

———————————————————

As part of a divorce decree, the trial court fashioned a permanent parenting plan for three minor children. The court's plan provided for substantially equal parenting time and joint decision making for major decisions. The plan was expressly conditioned on the parents remaining within the children's current school district after the divorce. The father argues that neither equal parenting time nor joint decision making were appropriate based on the evidence presented. And he maintains that the court lacked authority to include a residency requirement in the plan. He also contends that the court failed to address some of his claims. We conclude that the court, either expressly or implicitly, resolved all claims between the parties. And because the court did not abuse its discretion in establishing the parenting plan, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

William P. Holloway and Michael T. Fort, Franklin, Tennessee, for the appellant, Michael Charles Smallbone.

Grant C. Glassford, Nashville, Tennessee, for the appellee, Jennifer Elizabeth Smallbone.

# OPINION

## I.

### A.

In July 2018, Michael Charles Smallbone ("Father") filed a complaint for divorce from his wife of fourteen years, Jennifer Elizabeth Smallbone ("Mother"). Mother also sought a divorce. Both parents asked to be named primary residential parent for their three minor children, Nathaniel, Christian, and Cohen. Mother favored a joint custody arrangement with equal parenting time. Father, on the other hand, proposed that Mother only be awarded 120 days of residential parenting time.

In the final divorce decree, the court ordered the entry of a permanent parenting plan that provided for substantially equal parenting time and joint decision making for all major decisions. Father was designated the primary residential parent. The court's plan also included several special provisions. Of note, the parents were directed to jointly facilitate Nathaniel's mental health therapy; Mother was to remain compliant with her mental health treatment; and each parent was required to maintain a residence within the children's current school district.

### B.

Two pretrial disputes featured prominently at trial. The first involved the veracity of Mother's written discovery responses. In an amended complaint, Father alleged that some of Mother's responses were "false and perjurious." Relying on the doctrine of unclean hands, he asked the court to dismiss her countercomplaint for divorce and grant him a default judgment. And, at trial, he asked the court for an award of attorney's fees as a sanction for Mother's dishonesty.

In one discovery response, Mother claimed that she had deposited all of her income since the divorce filing into the couple's joint checking account. She was later forced to admit that she had actually deposited her income into a separate, undisclosed account in her own name. Mother also admitted at trial that she failed to disclose a 401(k) retirement account, an employee stock purchase plan, and the cash value of a life insurance policy. Mother denied that she intended to deceive anyone. She viewed her discovery failures as mistakes rather than falsehoods. But she conceded that her errors totaled approximately $300,000.

The other pretrial dispute involved Nathaniel's counseling. Before filing for divorce, Father had taken Nathaniel, then age four, to see Dr. Jay Woodman, a clinical psychologist. Father did not initially inform Mother. But, once he did, she was fully on

board. Dr. Woodman met with Nathaniel and both parents regularly in 2018. These initial visits ended in late 2018 by mutual agreement. Several months later, Father became concerned that Nathaniel needed more counseling. But Mother would not consent to additional counseling with Dr. Woodman. In response to Father's motion to resume counseling, she asserted that Father was "manufacturing these issues" to gain an unfair advantage in the divorce. She objected to Dr. Woodman acting as Nathaniel's counselor because he was also Father's expert witness. If Nathaniel needed more counseling, she suggested that the parties choose a neutral therapist. After a pretrial hearing, the court ordered the parents to continue Nathaniel's treatment with Dr. Woodman.

At trial, Father contended that Mother had no basis for objecting to his counseling request. He explained that, in the fall of 2019, Nathaniel had developed an explosive temper and made several disturbing comments. At the time, Mother denied witnessing this behavior. But, at trial, Mother admitted that she had also heard some disturbing statements from Nathaniel. Still, she insisted that she opposed Father's request mainly because Dr. Woodman was Father's expert witness. She believed Nathaniel should have an independent counselor.

C.

Mother's mental health also came under intense scrutiny at trial. She was diagnosed with a generalized anxiety disorder in 2010. Teresa Monroe Wilson, a psychiatric certified nurse practitioner, prescribed 200 milligrams of Zoloft, an anti-anxiety medication.

According to Father, Mother periodically erupted in fits of uncontrollable rage. During these episodes, she was verbally and physically abusive. Most of her ire was directed at Father. She hit him with a hairbrush, threw a set of keys at him, and cruelly twisted his injured finger. She never physically abused the children. But she yelled and made demeaning comments about Father in front them. Multiple video recordings from the security cameras in the marital home supported Father's story. These recordings showed Mother hurling invective at Father in front of the children, all in early 2018. At trial, Mother admitted that the video recordings exemplified poor parenting.

Mother explained that she was overwhelmed in 2018. On top of the rigorous demands of her full-time job as a speech pathologist, she was also attending nursing school. And she had three children at home under the age of five. She agreed that Father did his share of childcare when he was home. But he was busy with his law practice and talent agency. And his work involved occasional out-of-town travel. The maternal grandmother confirmed that Mother reached a breaking point in 2018. In her words, Mother was a "train wreck."

In her pretrial pleadings, Mother denied Father's allegations of abusive behavior. As Mother later explained, she had not yet seen the video recordings. Once confronted

with objective evidence of her behavior, she was humiliated and embarrassed, especially by the children's reaction. She expressed regret for her behavior and apologized repeatedly to both Father and the children.

Mother also sought additional mental health treatment. She reached out to her previous mental health provider, Teresa Wilson. Nurse Wilson quickly discovered that Mother's obstetrician had lowered her anti-anxiety medication during pregnancy. Nurse Wilson increased the prescription to its original strength, prescribed another anti-anxiety medication for emergencies, and recommended individual cognitive therapy. Mother followed all her recommendations.

Proof at trial confirmed that Mother took her medication as prescribed and participated in over 90 weekly therapy sessions with Dawn Beatty, a licensed clinical psychologist, as well as shorter monthly sessions with Nurse Wilson. Through therapy, Mother learned new ways to handle stress. She also made significant lifestyle changes. She withdrew from nursing school and switched to a more flexible job. Her new employment did not involve direct patient care, giving her more time at home with the children.

Mother's treating providers testified that Mother appeared genuinely interested in addressing her mental health issues. She complied with all their recommendations, and her anxiety symptoms had decreased. Mother's lay witnesses, as a whole, attested to her loving relationship with the children. In their view, she was a model parent.

Father questioned whether Mother had truly changed. He maintained that she could be aggressive, unpredictable, and unreasonable. Still, he conceded that Mother loved the children, and they loved her. He never objected to Mother spending time alone with the children.

### D.

While the divorce was pending, Dr. Woodman diagnosed Nathaniel with an anxiety adjustment disorder caused primarily by his exposure to parental conflict. Dr. Woodman opined that Nathaniel was doing reasonably well at the time of trial. Father agreed. Still, Dr. Woodman recommended that Nathaniel remain in counseling. He expected additional issues to arise as Nathaniel matured.

While treating Nathaniel, Dr. Woodman also worked with the parents on lowering the level of parental discord. Joint decision making was a skill that could be taught. And both parents had been receptive to his advice. Both parents were generally cordial to each other during his sessions. Yet he believed that the parents still needed help with joint decision making. They had different communication styles. Mother tended to be more emotional. Father was less reactive. And trust was an issue.

4

Dr. Woodman also warned the court, "as you increase the equality of time between the parents, you increase the need for them to coordinate and cooperate around the children." And conflict had a continuing impact on Nathaniel.

Father complained that it was difficult to co-parent with Mother. He questioned her truthfulness. He claimed it was difficult to reach a joint decision without a mediator. He viewed her pretrial objection to Nathaniel's counseling with Dr. Woodman as an example of her unwillingness to co-parent. She also failed to provide Father with a copy of the children's health insurance cards after he filed for divorce. Once, Father had to pay out-of-pocket for medical services for the children because he was unable to provide insurance information.

Mother admitted that she could have done a better job co-parenting. But she was working on her co-parenting skills in therapy. And she believed that she was improving. Both parents still lived in the marital residence with the children. But they no longer argued in front of the children. They communicated civilly, usually in text messages. While the divorce was pending, the parents took multiple separate trips to the beach with the children. Mother had been flexible when Father needed to change his chosen dates. And they had agreed on the children's extracurricular activities and current schools.

## II.

Father has several concerns with the terms of the court's permanent parenting plan. He contends that the court abused its discretion in fashioning a plan with substantially equal parenting time and joint decision making. He also challenges the provision requiring both parents to reside within the children's school district. Beyond these issues, Father maintains that the court failed to rule on his affirmative defense of unclean hands and his request for sanctions. And both parents seek an award of attorney's fees on appeal.

### A.

We first address Father's contention that the court failed to rule on all of his claims. This issue implicates our subject matter jurisdiction. Under Tennessee Rule of Appellate Procedure 3(a), an appeal "as of right" only lies from a final judgment. TENN. R. APP. P. 3(a); *In re Est. of Henderson*, 121 S.W.3d 643, 645 (Tenn. 2003). An order that resolves fewer than all the claims between all the parties is not a final judgment. TENN. R. APP. P. 3(a); *In re Est. of Henderson*, 121 S.W.3d at 645.

The doctrine of unclean hands is an equitable doctrine based on the principle that "he who seeks equity must do equity." *In re Est. of Boote*, 265 S.W.3d 402, 417 (Tenn. Ct. App. 2007). "When the doctrine applies, it provides the court with a basis to decline to grant relief to parties who have willfully engaged in unconscionable, inequitable, immoral,

or illegal acts with regard to the subject matter of their claims." *Id.* (footnote omitted). The decision as to whether to apply the doctrine is left to the discretion of the trial court after consideration of the unique facts and circumstance of each case. *Jolley v. Jolley*, No. M2011-02550-COA-R3-CV, 2013 WL 411454, at *3 (Tenn. Ct. App. Jan. 31, 2013) (citing *In re Est. of Boote*, 265 S.W.3d at 418); *see Wilder v. Wilder*, 863 S.W.2d 707, 713-14 (Tenn. Ct. App. 1992).

We conclude that the court implicitly addressed Father's claims. *See Morgan Keegan & Co. v. Smythe*, 401 S.W.3d 595, 608 (Tenn. 2013) ("[W]hen construing orders and judgments, effect must be given to that which is clearly implied, as well as to that which is expressly stated."). The court found that Mother's discovery responses were "materially incomplete and misleading." And she "repeatedly took positions in pleadings and in testimony that she later retracted." Courts have authority to sanction perjury though a variety of means. *Cummings v. Cummings*, No. M2003-00086-COA-R3-CV, 2004 WL 2346000, at *20 (Tenn. Ct. App. Oct. 15, 2004). An award of attorney's fees to the opposing party is but one option. *Id.* Here, the court chose to hold Mother accountable for her behavior with an adverse credibility finding, another permissible sanction. *See Norman v. Norman*, No. M2015-02364-COA-R3-CV, 2017 WL 3705121, at *5 (Tenn. Ct. App. Aug. 28, 2017); *Cummings*, 2004 WL 2346000, at *20 & n.14. The court's failure to grant Father his requested relief did not affect the finality of the divorce decree.

B.

While a trial court has broad discretion in fashioning a parenting plan, the touchstone is the best interest of the child. Tenn. Code Ann. § 36-6-106(a) (2017); *Maupin v. Maupin*, 420 S.W.3d 761, 770 (Tenn. Ct. App. 2013). The plan should "permit[ ] both parents to enjoy the maximum participation possible in the life of the child consistent with the [statutory best interest] factors . . . , the location of the residences of the parents, the child's need for stability and all other relevant factors." Tenn. Code Ann. § 36-6-106(a). Courts should fashion a parenting schedule "consistent with the child's developmental level and the family's social and economic circumstances, which encourage[s] each parent to maintain a loving, stable, and nurturing relationship with the child." *Id.* § 36-6-404(b) (2017). Unless certain limiting factors are dispositive, the court's decision should be based on a non-exclusive list of statutory factors in Tennessee Code Annotated § 36-6-106(a). *Id.*

The determination of a child's best interest presents a question of fact. *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013); *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007). Thus, we "presume that a trial court's factual findings on [best interest] are correct." *Armbrister*, 414 S.W.3d at 693. We do not overturn the trial court's best interest findings unless the evidence preponderates against them. *Id.*

6

1. Residential Parenting Schedule

Here, the court determined that a substantially equal parenting arrangement was in the children's best interest. At the time of trial, the children were seven and four. The court found that "[s]trong emotional ties exist[ed] between the children and both parents." The love the parents feel for the children "is reciprocated by the children in a developmentally appropriate fashion." The parents shared caregiving responsibilities during the marriage. Each parent, at times, acted as the primary caregiver. Both parents were able to provide for the children's needs. And their work schedules were flexible, allowing each parent to meet their respective parenting responsibilities. The family remained in the marital residence while this divorce was pending. So the children had not become accustomed to the parents living separately. The court reasoned that "the difficulty of the boys adjusting to [two households] will be mitigated somewhat by both parents having substantially equal parenting time."

Father concedes that "the vast majority of the trial court's findings of fact were accurate." But he challenges the court's analysis of multiple best interest factors.

Father maintains that he was the primary caregiver during the marriage, a finding relevant under two statutory factors. *See* Tenn. Code Ann. § 36-6-106(a)(1), (5). For the most part, both parents worked full-time throughout this marriage. Father testified that he was a "hands-on dad." He readied the children for school every day except Friday, Mother's day off. He prepared meals, changed diapers, and supervised baths. Mother was usually at work. Testimony from Shelly Hensley, a sitter once employed by the Smallbones, supported Father's claim. Yet Father was the sole owner of two businesses, one of which required travel. And he testified that, after Mother changed jobs, she took on more childcare responsibilities.

For her part, Mother claimed the parents shared childcare duties, depending on their work schedules. Contrary to Father's argument on appeal, several witnesses corroborated Mother's testimony on this point. They agreed that Mother made the children a priority when she was not working. On this record, we cannot say that the evidence preponderates against the court's finding of shared responsibility. *See Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001) (evidence preponderates against a factual finding when it "support[s] another finding of fact with greater convincing effect").

Father also asserts that the issues with the health insurance cards and Nathaniel's counseling show that Mother lacked the disposition to provide for the children's needs. *See* Tenn. Code Ann. § 36-6-106(a)(4). The court found this evidence more relevant to Mother's commitment to co-parenting. We tend to agree. On the whole, both parents have provided for the children's needs. The cited evidence does not tilt this factor in Father's favor.

7

Father relies heavily on Mother's egregious behavior in the video recordings from 2018. *See id*. § 36-6-106(a)(11). In his eyes, this record is replete with evidence of abuse sufficient to limit Mother's parenting time. *See id*. § 36-6-406(a)(2) (2017). A court should limit a parent's residential time if it determines "that a parent has engaged in . . . [p]hysical . . . abuse or a pattern of emotional abuse of the [other] parent [or the children]." *Id*. Although the court found that Nathaniel suffered adverse emotional effects from exposure to parental conflict, the court did not expressly limit Mother's parenting time.

Based on the court's findings, we conclude that it also implicitly found that Mother's past conduct was not dispositive of the residential schedule. *See Morgan Keegan & Co.*, 401 S.W.3d at 608. The court found that Mother's "ability to cope with the stress and demands of parenting was impaired in 2017 and 2018." Since then, Mother "has come to understand the harmful affect her behavior has had on the children." She "expressed embarrassment and regret over her conduct." And she made substantial changes in her life. She "reduced the demands on her time by discontinuing nursing school and finding a different job with more flexible hours." She also "obtained mental health therapy." Based on the evidence presented, the court determined that Mother "is a better parent today than she was in 2018." The evidence does not preponderate against these findings.

Similarly, Father argues that Mother's anxiety "has and can" adversely affect her parenting. *See* Tenn. Code Ann. § 36-6-106(a)(8). But again the court found that she "is a better parent today." And the court recognized that her ability to parent depended on remaining compliant with her mental health treatment. Mother's continued compliance is a condition of the parenting plan.

Finally, Father maintains that the record evidence establishes that the parents are unable to cooperate. And Dr. Woodman warned that equal parenting time risked increasing the conflict between these parents.[1] Father relies on *Rajendran v. Rajendran*, No. M2019-00265-COA-R3-CV, 2020 WL 5551715 (Tenn. Ct. App. Sept. 16, 2020), for the proposition that "continuing lack of trust and inability to cooperate" between parents precludes a joint parenting arrangement. *Id*. at *11. In *Rajendran*, we held that the trial court abused its discretion in ordering equal parenting time. *Id*. Our decision, however, was based on more than the parties' "continuing animosity" and "marked lack of trust." *Id*. at *9. We concluded that the court failed to properly weigh the statutory factors. *Id*. at *5-7. The majority of the factors favored the child's mother, who had always been the child's primary caregiver. *Id*. at *7. And the child's father had "shown an unwillingness

---

[1] The court noted Dr. Woodman's fears. But, in light of the evidence that the parents are capable of cooperating when it is in the children's best interest, the court chose not to assume those fears would be realized. *See Thurmon v. Sellers*, 62 S.W.3d 145, 162 (Tenn. Ct. App. 2001) ("Expert testimony is not conclusive, even if uncontradicted, but is rather purely advisory in character, and the trier of fact may place whatever weight it chooses on such testimony.").

to be accommodating to Mother's requests for flexibility and cooperation in the parenting arrangement." *Id.* at *10.

By contrast, we discern no errors in the court's analysis of the statutory factors here. The court specifically found that the parents shared childcare responsibilities. The children have "strong emotional ties" with both parents. There was no evidence of parental alienation. As the family had remained in the marital home, the children had not become accustomed to the extended absence of one parent. While the parents have trust issues, this record shows that they are capable of cooperation. They both fully participated in Dr. Woodman's sessions with Nathaniel. They arranged multiple separate trips with the children. Mother willingly changed her travel plans at Father's request. Despite various disagreements, the parents have successfully coordinated schedules and childcare responsibilities for the two years that this divorce was pending. This is not a case in which one parent has exhibited such "unrelenting and irrational hostility" that it would preclude consideration of an equal parenting plan. *See Rucker v. Harris*, No. M2013-01240-COA-R3-JV, 2014 WL 3530851, at *4 (Tenn. Ct. App. July 15, 2014).

Based on our review, the court did not abuse its discretion in fashioning this residential schedule. The best interest analysis is a "particularly fact-intensive process." *McEvoy v. Brewer*, No. M2001-02054-COA-R3-CV, 2003 WL 22794521, at *5 (Tenn. Ct. App. Nov. 25, 2003). Our role is not to "tweak a visitation order in the hopes of achieving a more reasonable result than the trial court." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001). The court applied the correct law, the evidence does not preponderate against its factual findings, and its decision is within the range of acceptable alternative dispositions. *See Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). If Father's predictions prove true and the joint parenting arrangement becomes unworkable, our legal system provides a remedy. *See In re Emma E.*, No. M2008-02212-COA-R3-JV, 2010 WL 565630, at *7 (Tenn. Ct. App. Feb. 17, 2010).

2. Joint Decision-Making Authority

Father also challenges the trial court's award of joint decision-making authority. When allocating decision-making authority, our courts consider several factors including each parent's history of decision making for the children and "[w]hether the parents have demonstrated the ability and desire to cooperate with one another in decision making regarding the child." Tenn. Code Ann. § 36-6-407(c)(2)-(3) (2017). An award of sole decision-making authority is appropriate when:

(1) A limitation on the other parent's decision-making authority is mandated by § 36-6-406;
(2) Both parents are opposed to mutual decision making; or

9

(3) One (1) parent is opposed to mutual decision making, and such opposition is reasonable in light of the parties' inability to satisfy the criteria for mutual decision-making authority.

*Id.* § 36-6-407(b).

Father contends that the parents have not demonstrated an ability to cooperate. Mother failed to provide him with copies of the children's health insurance cards. She objected to counseling with Dr. Woodman. She deliberately scheduled medical appointments for the children at times when Father could not attend. He maintained that reaching a joint decision with Mother was difficult. Dr. Woodman agreed that the parents still needed help.

Even so, we cannot say that the court abused its discretion in the allocation of decision-making authority. On this record, the parents appear capable of reaching joint decisions on matters of great importance to the children. *Cf. Coley v. Coley*, No. M2007-00655-COA-R3-CV, 2008 WL 5206297, at *7 (Tenn. Ct. App. Dec. 12, 2008) (reasoning that joint decision making was inconsistent with the court's specific finding that the parents "were unable to agree on a number of matters regarding their children"). As the court noted, the parents were able to make joint decisions about major issues during the marriage. At trial, they agreed on the children's current schools and extracurricular activities. With respect to health care, their disagreements have been more logistical than substantive. Mother did not oppose Nathaniel's counseling; she objected to the counselor. And the court removed at least two obstacles to future cooperation. The plan requires Father to provide health insurance for the children and both parents to facilitate Nathaniel's continued counseling with Dr. Woodman.

3. Special Residency Provision

The court conditioned the parenting plan on both parties maintaining a residence within the children's school district. Father contends that the court's residency requirement was an abuse of discretion. *See Cummings*, 2004 WL 2346000, at * 15-16. In *Cummings*, the trial court issued an injunction to prevent one parent from moving outside the county without the consent of the other parent or the court. *Id.* at *15. We held the injunction was beyond the court's authority. *Id.* at *16.

Here, the trial court did not issue an injunction. Rather, both parents agreed at trial that the children, particularly Nathaniel, should remain in their current schools. Father told the court that he intended to establish his new home within the school district. The court's plan merely incorporated the parents' agreement. Should one parent choose to move outside the school district, the plan may require modification. But the special residency provision in the plan was not an abuse of discretion.

10

C.

Finally, both Mother and Father ask for an award of attorney's fees on appeal. Under Tennessee Code Annotated § 36-5-103(c) (Supp. 2020), we have discretion to award such fees. *Pippin v. Pippin*, 277 S.W.3d 398, 407 (Tenn. Ct. App. 2008); *Shofner v. Shofner*, 181 S.W.3d 703, 719 (Tenn. Ct. App. 2004). In exercising our discretion, we consider: (1) the requesting party's ability to pay the accrued fees; (2) the requesting party's success in the appeal; (3) whether the requesting party sought the appeal in good faith; and (4) any other relevant equitable factors. *Hill v. Hill*, No. M2006-02753-COA-R3-CV, 2007 WL 4404097, at *6 (Tenn. Ct. App. Dec. 17, 2007). In light of these factors, we decline to award either party attorney's fees on appeal.

**III.**

We conclude that the trial court resolved all disputed claims between the parties. And the court did not abuse its discretion in fashioning the permanent parenting plan. So we affirm. This case is remanded to the trial court for such other proceedings as are necessary and consistent with this opinion.

                 s/ W. Neal McBrayer
                 W. NEAL MCBRAYER, JUDGE