IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 3, 2023 Session

FILED
10/30/2024
Clerk of the
Appellate Courts

## SAMUEL FORRESTER HUNTER v. WINNIE SUE COOPER

**Appeal from the Chancery Court for Williamson County**
**No. 19CV48536      James G. Martin III, Chancellor**

———————————————————

**No. M2022-01050-COA-R3-CV**

———————————————————

After declaring the parties divorced, the trial court fashioned a permanent parenting plan for their minor child. The plan designated the mother as the primary residential parent and gave the father 80 days of parenting time each year. The father argues that the trial court abused its discretion in adopting a parenting plan that failed to maximize his parenting time. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which ARNOLD B. GOLDIN and JEFFREY USMAN, JJ., joined.

Donald Capparella and Jacob A. Vanzin, Nashville, Tennessee, for the appellant, Samuel Forrester Hunter.

P. Edward Schell, Franklin, Tennessee, for the appellee, Winnie Sue Cooper.

## OPINION

### I.

### A.

After less than two years of marriage, Samuel Forrester Hunter ("Father") filed for a divorce from his fourth wife, Winnie Sue Cooper ("Mother"). Mother counterclaimed for divorce. In their respective filings, both parents asked to be named primary residential parent of their six-month-old child.

After the divorce filing, Father had only sporadic contact with the child. In December 2019, the court established a temporary parenting plan designed to create a bond between them. Father had multiple short visits throughout December. Then, beginning in January 2020, the temporary plan gave Father four two-hour visits during the week and one overnight visit on the weekend. Because of Father's busy work schedule, the court directed him to send a text message to Mother "no later than 3:00 pm on the day parenting time [wa]s to begin that he intend[ed] to exercise the designated time." If he failed to do so, Father forfeited his parenting time.

Almost two years later, the case went to trial.[1] Both parents endeavored to prove that their proposed parenting plans were in their child's best interest. In addition to the parents, the court heard evidence from a wide variety of witnesses, including two experts.

Proof at trial showed that Father is a neuroimmunologist with a Ph.D. in pharmacology-toxicology. He owned a private medical clinic where he primarily treated patients with multiple sclerosis. He also provided consulting services, performed sponsored research, and authored numerous studies in medical journals. Father often worked more than 12 hours a day. A well-known expert in his field, he traveled extensively for speaking engagements.

During the marriage, Mother was employed as Father's office manager. After the child was born, Mother was the primary caregiver. She never returned to her former position in the medical clinic. While the child was still an infant, Mother severely fractured her arm, requiring surgical repair. Even then, Mother continued to care for the child without assistance from Father. After Father moved out, Mother obtained a job in the insurance industry and enrolled the child in daycare while she worked.

During Father's first few visits with the child under the temporary plan, he became convinced that she was developmentally delayed. He voiced his concerns with the court and the child's pediatrician. Mother maintained that Father's concerns were unwarranted. Without Mother's knowledge or consent, Father arranged for developmental testing through Tennessee Early Intervention Services. Father then forwarded the test report to the child's pediatrician, who agreed that further evaluation was reasonable.

With input from both parents, Dr. Rachel Goode, a developmental and behavioral pediatrician, conducted the evaluation. She identified possible delays in the child's fine motor and receptive language skills. Dr. Goode strongly recommended a formal speech language therapy evaluation. She also suggested that additional testing by an occupational therapist "would not be inappropriate."

---

[1] Mother and Father also presented evidence on a myriad of other issues not relevant to this appeal.

The additional occupational therapy testing was reassuring. The child's fine motor skills were normal for her age. Because the child had some difficulty transitioning between activities and the parents gave conflicting reports about her sensory processing skills, the therapist recommended some sensory integration therapy and home programming. Still, the therapist considered the child to be "fairly average."

The formal speech and language evaluation was inconclusive. The therapist noted that the test she used relied heavily on parent input. And the parents gave conflicting reports about the child's communication skills. Based on those reports, the child's language skills were in the average range. But the child did not demonstrate average communication skills in the therapy clinic. Unable to definitively rule out a speech delay, the therapist recommended another evaluation in a year.

After reviewing these reports, Dr. Goode remained concerned about a possible speech delay. She recommended that the parents arrange a "play-based language assessment, if possible[,]" in six months. Although she was no longer concerned about fine motor delay, she advised the parents "it would be wise" to do the recommended home exercises to help with any transition issues.

At trial, Mother and Father still had diametrically opposed views on the child's development. Father contended that, at two and a half years old, she lagged behind her peers in language development and toilet training. Father wanted to remove her from daycare. As he explained, "I can, with a nanny, tailor what she gets and provide more in direct enrichment for the child." Mother was happy with the child's progress. She believed it was in the child's best interest to remain at her current daycare facility.

The director and assistant director of the daycare explained that their staff was trained in child development. Overall, the child was "pretty normal" for her age. Her teachers were working to expand her vocabulary. And although she was not yet fully toilet trained, they were not overly concerned.

Father acknowledged that he had been banned from the daycare campus. He hired surrogates to pick up the child from daycare when he had parenting time. He blamed Mother for turning the daycare personnel against him. The daycare director explained that Father was banned because of his unacceptable behavior. On three occasions, Father became visibly upset when daycare staff did not accede to his demands. His angry rants were disturbing and disruptive. The director had never experienced similar behavior from another parent.

Father claimed Mother was the volatile parent. He believed she had untreated bipolar disorder. She yelled at him for no reason. And she tried to turn his family and co-workers against him. Mother candidly admitted that she took medication for depression. At Father's insistence, she began seeing a psychiatrist during the marriage. She

3

acknowledged that Father often made her angry. But she claimed he was equally to blame for their ongoing conflict.

Father also complained that Mother was inflexible about the temporary parenting schedule. Despite his busy work schedule, Father exercised most of his temporary parenting time. According to Father, he would have liked even more time with his daughter, but Mother denied his repeated requests to pick up the child early from daycare. Still, he admitted that Mother gave him extra time with the child on some Saturdays.

Mother proposed Father receive residential parenting time every other weekend plus two hours on Wednesday, for a total of 71 days. Although she had no objections to the temporary plan schedule, Mother had concerns about Father's parenting. She claimed that the child often returned from Father's care with a dirty diaper and unexplained bruises. She struggled to get away from Father and clung to Mother, wanting to "snuggle." After the overnight visits, she showed signs of dehydration and sometimes had a diaper rash.

Father proposed a permanent parenting plan with equal parenting time. He also wanted sole decision-making on education and medical care. He felt that the child's daycare was "neglecting" him. And he questioned the quality of the daycare curriculum. He also wanted to direct the treatment for the child's developmental delay. As for the parenting schedule, a weekly exchange would be acceptable, but he preferred a two-week rotation. In his view, two weeks gave him more freedom to travel with the child and reduced the number of exchanges, which were often stressful. He brushed off the court's concern about the effect this plan would have on the child, noting that Mother could see her at school.

Dr. Bradley Freeman, a clinical psychologist, gave expert testimony on Mother's mental health and sobriety. In his opinion, Mother did not meet the criteria for bipolar disorder. He believed she had an adjustment disorder with anxiety and depressive features. Mother had multiple stressors in her life, including the pending litigation. When these stressors abated, he expected her mental status and behavior to normalize. He recommended that she continue her current mental health treatment. As for sobriety, his toxicology testing showed moderate alcohol use, but he discerned no signs of substance abuse. Still, he recommended that Mother refrain from alcohol use during parenting time for the child's safety and to allay Father's fears.

Dr. Freeman opined that Mother was able to make safe and rational parenting decisions. He acknowledged that Mother tended to become upset and angry when interacting with Father. In his opinion, Father contributed to the conflict, by "fanning the flames, so to speak." He recommended that Mother learn how to cope better with the challenges of co-parenting with Father. Although Mother viewed Father as a negative influence, Dr. Freeman did not foresee any real danger of parental alienation.

4

Father's expert was Dr. William Kenner. In Dr. Kenner's view, Mother was quick-tempered and argumentative. While he had never met her, he had reviewed Dr. Freeman's report and interviewed Father, among others. Given Mother's negative attitude toward Father, he was highly concerned about parental alienation. To combat that danger, he recommended a parenting plan that gave Father "significant time" with the child.

Dr. Kenner conceded that Father had both obsessive compulsive and narcissistic personality traits. He could be domineering and overcontrolling. And he had little tolerance for disagreement. Dr. Kenner acknowledged these traits would be frustrating for others. Still, he believed Father was fully capable of caring for the child. He did not foresee any problems until her adolescent years. He recommended that Father participate in psychotherapy to develop his communication skills.

Both experts agreed that Mother and Father were unable to engage in joint decision making due to their ongoing hostility and ineffective communication. These parents disagreed on almost every aspect of raising their child. To lessen the conflict, the experts recommended indirect communication through a coparenting application. They also agreed that the parents should abstain from alcohol during parenting time and use an alcohol monitoring device. The parents should follow the treatment recommendations of the child's health care providers. And Mother should continue to engage in regular mental health treatment.

B.

After considering the proof in light of the statutory best interest factors, the court adopted a permanent parenting plan that it believed was in the child's best interest. The court issued a detailed 68-page memorandum opinion explaining its decision.

In the court's eyes, most of the relevant best interest factors favored Mother. Mother had been the child's primary caregiver since birth. They shared a close, loving relationship. *See* Tenn. Code Ann. § 36-6-106(a)(1), (5) (2017). While both parties appeared to encourage the child's intellectual and moral development, they disagreed on her education. Father wanted to employ a nanny in lieu of daycare. Mother believed that the child should remain in daycare, where she was thriving. Daycare attendance, according to the medical witnesses, was beneficial for her development. In the court's eyes, Mother's position showed a stronger appreciation of the child's needs than Father's did. Despite Mother's negativity at the outset of the divorce, the court found she was willing to foster a close and continuing relationship between Father and child. The court had less confidence in Father, who plainly viewed Mother as inferior. Based on his conduct during the divorce litigation, the court also had significant concerns about Father's willingness to obey a court-ordered parenting plan. Father was likely to take whatever action he believed was appropriate no matter what the court had to say on the matter. *See id.* § 36-6-106(a)(2). Father historically worked extremely long hours. He claimed that his work schedule was flexible and that he

intended to devote more time to family. But the court was not convinced. By contrast, Mother's work schedule was fixed. *See id.* § 36-6-106(a)(14).

The court found some factors relatively equal. Both parents were willing to provide the child with necessary care. Although they disagreed on how to promote her healthy development, both agreed to follow the recommendations of her healthcare providers. *See id.* § 36-6-106(a)(4). Both parents had a loving relationship with her, although Mother's relationship was stronger. *See id.* § 36-6-106(a)(6). The court also found both parents had some deficiencies, whether moral, mental, or emotional, that related to their abilities to parent. But the court had no concerns about the child's safety. *See id.* § 36-6-106(a)(8). And the court was satisfied that any developmental issues were being addressed. *See id.* § 36-6-106(a)(7). The court found the remaining factors inapplicable on these facts.

The court determined that equal parenting time was unwarranted due to the highly contentious relationship between the parents. They were unable to communicate effectively on matters related to the child. The court named Mother the primary residential parent with sole decision-making authority. All total, the court awarded Father 80 days of parenting time. Father had parenting time every other weekend plus two hours every Tuesday and Thursday. He also received two nonconsecutive weeks in the summer, alternating school breaks, and multiple holidays. As in the temporary plan, the court directed Father to notify Mother by 3:00 p.m. whether he intended to exercise his designated parenting time.[2]

## II.

A trial court has broad discretion in fashioning parenting arrangements. *Armbrister v. Armbrister*, 414 S.W.3d 685, 693 (Tenn. 2013). The touchstone is always the best interest of the child. Tenn. Code Ann. § 36-6-106(a); *Maupin v. Maupin*, 420 S.W.3d 761, 770 (Tenn. Ct. App. 2013) (citing Tenn. Code Ann. § 36-6-401(a) (2021)). The plan should "permit[ ] both parents to enjoy the maximum participation possible in the life of the child consistent with the [best interest] factors . . . , the location of the residences of the parents, the child's need for stability and all other relevant factors." Tenn. Code Ann. § 36-6-106(a). Courts should establish a parenting schedule "consistent with the child's developmental level and the family's social and economic circumstances, which encourage[s] each parent to maintain a loving, stable, and nurturing relationship with the child." *Id.* § 36-6-404(b) (2021). Unless certain limiting factors are dispositive, the court's

---

[2] The plan also incorporated the additional provisions recommended by the expert witnesses. Both parents were directed to participate in coparenting counseling, to abstain from alcohol and other non-prescribed intoxicants, to communicate indirectly through a coparenting app, and to follow the recommendations of the child's health care providers. Mother was required to continue her regular mental health treatment. The plan also contained specific requirements for monitoring compliance with the sobriety provisions.

decision should be based on a non-exclusive list of statutory factors in Tennessee Code Annotated § 36-6-106(a). *Id.*

The determination of a child's best interest presents a question of fact. *Armbrister*, 414 S.W.3d at 692; *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007). Thus, we "presume that a trial court's factual findings on [best interest] are correct." *Armbrister*, 414 S.W.3d at 693. We do not overturn the trial court's best interest findings unless the evidence preponderates against them. *Id.* In weighing the preponderance of the evidence, the trial court's findings of fact based on witness credibility are given great weight, and they will not be overturned "absent clear and convincing evidence to the contrary." *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007).

A trial court abuses its discretion only if it applies the wrong legal standard, reaches "an illogical or unreasonable decision," or bases its decision "on a clearly erroneous assessment of the evidence." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010); *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). When reviewing a discretionary decision, we must determine: "(1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions." *Lee Med., Inc.*, 312 S.W.3d at 524; *see Harmon v. Hickman Cmty. Healthcare Servs., Inc.*, 594 S.W.3d 297, 306 (Tenn. 2020).

A.

Father contends that the trial court abused its discretion in adopting a parenting plan that failed to maximize his parenting time. The best interest statute directs courts to fashion parenting schedules with an eye toward maximizing both parents' participation in the child's life, if possible. Tenn. Code Ann. § 36-6-106(a); *Gooding v. Gooding*, 477 S.W.3d 774, 778 (Tenn. Ct. App. 2015). But the "maximum participation" goal is not the court's primary concern. *Flynn v. Stephenson*, No. E2019-00095-COA-R3-JV, 2019 WL 4072105, at *7 (Tenn. Ct. App. Aug. 29, 2019); *see In re Cannon H.*, No. W2015-01947-COA-R3-JV, 2016 WL 5819218, at *6 (Tenn. Ct. App. Oct. 5, 2016). The "overarching standard" remains the best interest of the child. *Armbrister*, 414 S.W.3d at 693; *Flynn*, 2019 WL 4072105, at *7.

Father complains that the court failed to "cite the statutory requirement of maximizing parenting time, analyze it, [and] give reasons why maximizing parenting time would not be in [the child]'s best interest." Simply put, the court was not required to do so. We have long recognized that a trial court's failure to list and discuss each best interest factor does not mean that the factors were not considered. *See Keisling v. Keisling*, 196 S.W.3d 703, 723 (Tenn. Ct. App. 2005). The same principle applies here: a trial court's failure to cite or discuss the requirement to maximize parenting time does not mean that

the requirement was not considered. *See, e.g.*, *In re Cannon H.*, 2016 WL 5819218, at *6; *Rucker v. Harris*, No. M2013-01240-COA-R3-JV, 2014 WL 3530851, at *6 (Tenn. Ct. App. July 15, 2014).

Citing an unreported decision from this Court, Father argues that we have "held that if a trial court is going to deviate from the maximum participation standard, [the court must] mention the standard . . . and explain why the deviation is required." *See Flynn*, 2019 WL 4072105, at *7. Father misapprehends the cited opinion. In *Flynn v. Stephenson*, the parenting plan order contained no best interest analysis or findings of fact in support of the plan. *Id.* at *2, *6. This Court held that the trial court's order was "plainly insufficient." *Id.* at *4; *see* TENN. R. CIV. P. 52.01. As we explained, it was "incumbent upon the trial court" to support its decision with "express findings of fact contained in its written order." *Flynn*, 2019 WL 4072105, at *7.

Here, although the trial court did not expressly cite the "maximum participation" language in the statute, the court conducted a detailed best interest analysis. And it clearly explained why equal parenting was not in the child's best interest. There was overwhelming evidence that Mother and Father's relationship was "fractious as it relates to [the child]." They were unable to "communicate on any level." Equal parenting arrangements require a "harmonious and cooperative relationship between both parents." *Darvarmanesh v. Gharacholou*, No. M2004-00262-COA-R3-CV, 2005 WL 1684050, at *7 (Tenn. Ct. App. July 19, 2005) (quoting *Dodd v. Dodd*, 737 S.W.2d 286, 290 (Tenn. Ct. App. 1987)).[3] That was not the case here.

B.

Father reminds us that there is a "wide gulf" between equal parenting time and the 80 days he ultimately received. And the court found no evidence of any limiting factors. *See* Tenn. Code Ann. § 36-6-406 (2017). He insists that this record supports a parenting schedule that affords him more parenting time. We agree that the court made several positive findings about Father's parenting. Yet the court also made some negative ones. The court had significant concerns about Father's child-rearing perspective. Throughout the trial, Father "consistently referred to [his daughter] as 'the child,' or 'the baby,' as if she was an object rather than a person with a name." From the court's observations, Father appeared "determined to have his way, whether it was with his wife, the Court or others." The court feared that Father would display similar conduct with the child. Father's expert

---

[3] Father suggests that *Darvarmanesh v. Gharacholou* is inapplicable because it was decided before the "maximum participation" language was added to the best interest statute. No. M2004-00262-COA-R3-CV, 2005 WL 1684050, at *7 (Tenn. Ct. App. July 19, 2005). We disagree. *See Rajendran v. Rajendran*, No. M2019-00265-COA-R3-CV, 2020 WL 5551715, at *9 (Tenn. Ct. App. Sept. 16, 2020) (explaining the addition of the "maximum participation" language did not "significantly alter[] this Court's prior decisions" on equal parenting).

recognized that "problems will come when [she] is an adolescent." The court also took note of the ways Father prioritized his own needs or desires above hers, such as his preference for a two-week rotation and his opinion on daycare.

Father contends that the evidence preponderates against the court's findings on two best interest factors. Among other things, the second factor considers each parent's willingness and ability to facilitate the child's relationship with the other parent. *Id.* § 36-6-106(a)(2). Another factor looks at the parents' employment schedules. *Id.* § 36-6-106(a)(14). The court found both factors favored Mother. Based on our review of the record, the evidence does not preponderate against the court's findings. Despite Mother's negative view of Father, she never denied him his court-ordered parenting time. She even allowed him extra time with the child on Saturdays. Considering this behavior, we are not inclined to place much weight on Mother's emotional outbursts at the outset of the divorce. As for the parents' employment schedules, Father points out that, as a self-employed physician, his work schedule is more flexible. Still, on balance, Father has a more demanding schedule than Mother.

Given the success of the temporary plan, Father also contends that it was illogical for the court to craft a permanent schedule that gave him less parenting time than the temporary plan. Courts should not "draw any presumptions from the temporary plan." *Id.* § 36-6-406(e). Still, "when a temporary parenting plan is in place for a long time, courts may consider that when determining the details of a permanent plan." *Woody v. Woody*, No. E2020-01200-COA-R3-CV, 2022 WL 678976, at *20 (Tenn. Ct. App. Mar. 8, 2022). Here, the court expressly recognized that the temporary plan had enabled Father to establish a bond with his daughter. With that initial goal satisfied, the court was then tasked with establishing a parenting schedule which would encourage both parents to "maintain a loving, stable, and nurturing relationship with the child." Tenn. Code Ann. § 36-6-404(b). The court determined that it was in the child's best interest to establish a different parenting schedule in the permanent plan. *See id.* (directing the court to consider the best interest factors in making the residential schedule). Based on this record, we see nothing illogical about the court's decision to deviate from the temporary plan.

Father argues that the court had several available avenues to better maximize his parenting time. The court could have granted him overnight parenting time during the week, allowed him to pick up the child from daycare before 5 p.m., or awarded him two additional weeks of parenting time in the summer. We see no basis in this record to question the court's judgment on these details of the parenting plan. Our role is not to "tweak a visitation order in the hopes of achieving a more reasonable result than the trial court." *Eldridge*, 42 S.W.3d at 88. The "maximum participation" goal does not "alter or diminish the trial court's broad discretion in fashioning permanent parenting plans." *Flynn*, 2019 WL 4072105, at *7.

9

The court's decision to award Father 80 days of parenting time was not an abuse of discretion. Contrary to Father's arguments on appeal, we find no indication that the court chose this parenting schedule based on irrelevant facts. The trial court weighed the relevant statutory factors and gave "significant thought to a parenting schedule that would be in [the child]'s best interest." The best interest analysis is particularly "fact-intensive." *Grissom v. Grissom*, 586 S.W.3d 387, 394 (Tenn. Ct. App. 2019). These decisions "often hinge on subtle factors, including the parents' demeanor and credibility during the . . . proceedings." *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996). The court applied the correct law, the evidence does not preponderate against its factual findings, and the decision is within the range of acceptable alternative dispositions. *See Lee Med., Inc.*, 312 S.W.3d at 524.

## III.

The trial court did not abuse its discretion in fashioning the permanent parenting plan. So we affirm.

s/ W. Neal McBrayer
W. NEAL McBRAYER, JUDGE

10